## AUSTIN *v.* UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 39.   Argued October 26, 1894. — Decided December 17, 1894.

The act of March 3, 1883, c. 111, 22 Stat. 804, authorizing the Court of Claims to hear and determine the claims of the successors and representatives of Sterling T. Austin, deceased, for cotton alleged to have been taken from him in Louisiana by the authorities of the United States in 1863, 1864, and 1865, "any statute of limitation to the contrary notwithstanding, *provided, however,* that it be shown to the satisfaction of the court that neither Sterling T. Austin, Senior, nor any of his surviving representatives, gave any aid or comfort to the late rebellion, but were throughout the war loyal to the government of the United States," made the establishment of loyalty in fact, as contradistinguished from innocence in law produced by pardon, a prerequisite to jurisdiction, and the Court of Claims, having found that the claimant was not thus loyal, properly dismissed the petition.

CLAIMANT filed a petition in the Court of Claims, June 5, 1883, alleging that Sterling T. Austin, of the parish of Carroll, in the State of Louisiana, died in that State July 9, 1879; that March 20, A.D. 1883, claimant was duly appointed administratrix of the estate of said decedent, and duly qualified as such; and that her letters of administration were in full force.

The petition set up an act of Congress, approved March 3, 1883, c. 111, 22 Stat. 804, entitled "An act for the relief of the representatives of Sterling T. Austin, deceased," which referred the claims of the successors in interest and legal representatives of Sterling T. Austin for cotton taken by the military authorities of the United States during the war to the Court of

Claims, to adjust and settle and to render judgment for the net amount realized by the United States therefrom, removing the bar of any statute of limitation, and providing that it be shown to the satisfaction of the court that neither Austin nor any of his surviving representatives "gave any aid or comfort to the late rebellion, but were throughout the war loyal to the government of the United States."

It was then charged that, in the years 1863, 1864, and 1865, the military authorities took from Sterling T. Austin, claimant's decedent, in the States of Louisiana and Texas, large amounts of cotton; that the United States sold said cotton and realized therefrom various sums, aggregating $367,500, which they appropriated to their own use; that Sterling T. Austin left him surviving a widow and children; that neither he nor his widow, nor either of his children, "gave any aid or comfort to the late rebellion, but they and each of them were and was throughout the war loyal to the government of the United States." Judgment was asked "for the sum of three hundred and sixty-seven thousand five hundred dollars, being the net amount realized by the United States from the sale of the cotton hereinbefore referred to and described."

The averments of the petition were traversed by the United States. The Court of Claims filed findings of fact and a conclusion of law.

The court was not satisfied that Sterling T. Austin did not give aid or comfort to the late rebellion, and that he was loyal throughout the war to the government of the United States, and found him disloyal; but the court was satisfied that the surviving representatives did not give any aid and comfort to the late rebellion, but were throughout the war loyal to the government of the United States.

The conclusion of law was that "the court decides upon the foregoing facts that the petition be dismissed." The opinion of the court, by Weldon, J., will be found in 25 C. Cl. 437. Judgment having been thereupon entered dismissing the petition, claimant appealed to this court.

*Mr. John C. Fay* and *Mr. Samuel Shellabarger* for appellant.

*Mr. Assistant Attorney General Conrad* for appellees.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

An act amending the act establishing the Court of Claims was approved March 3, 1863, c. 92, which by its tenth section prescribed a limitation of six years on the prosecution of claims, and in its twelfth section provided "that in order to authorize the said court to render a judgment in favor of any claimant, if a citizen of the United States, it shall be set forth in the petition that the claimant, and the original and every prior owner thereof where the claim has been assigned, has at all times borne true allegiance to the government of the United States, and whether a citizen or not, that he has not in any way voluntarily aided, abetted, or given encouragement to rebellion against the said government, which allegations may be traversed by the government, and if on the trial such issue shall be decided against the claimant, his petition shall be dismissed." 12 Stat. 765, 767. On the same day an act was passed authorizing the Secretary of the Treasury to appoint special agents to collect and receive all abandoned or captured property in any State or Territory, or any portion of any State or Territory, of the United States designated as in insurrection, the second section of which required that "all sales of such property shall be at auction to the highest bidder, and the proceeds thereof shall be paid into the Treasury of the United States;" and the third section, after making provision for the giving of bonds and the keeping of books, "showing from whom such property was received, the cost of transportation, and proceeds of the sale thereof," proceeded thus: "And any person claiming to have been the owner of any such abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims; and on proof to the satisfaction of said court of his ownership of said property, of his right to the proceeds thereof, and that he has never given any aid or comfort to

the present rebellion, to receive the residue of such proceeds, after the deduction of any purchase money which may have been paid, together with the expense of transportation and sale of such property, and any other lawful expenses attending the disposition thereof." Act of March 3, 1863, c. 120, 12 Stat. 820.

By joint resolution, No. 25, approved March 30, 1868, it was resolved ".that all moneys which have been received by any officer or employé of the government, or any department thereof, from sales of captured and abandoned property in the late insurrectionary districts, under or under color of the several acts of Congress providing for the collection and sale of such property, and which have not already been actually covered into the treasury, shall immediately be paid into the treasury of the United States, together with any interest which has been received or accrued thereon." 15 Stat. 251.

June 25, 1868, an act was approved entitled "An act to provide for appeals from the Court of Claims and for other purposes," allowing an appeal to the Supreme Court of the United States from all final judgments of the Court of Claims adverse to the United States. The third section of this act provided "that whenever it shall be material in any suit or claim before any court to ascertain whether any person did or did not give any aid or comfort to the late rebellion, the claimant or party asserting the loyalty of any such person to the United States during such rebellion, shall be required to prove affirmatively. that such person did, during said rebellion, consistently adhere to the United States, and did give no aid or comfort to persons engaged in said rebellion; and the voluntary residence of any such person in any place where, at any time during such residence, the rebel force or organization held sway, shall be *prima facie* evidence that such person did give aid and comfort to such rebellion and to the persons engaged therein." c. 71, 15 Stat. 75.

On the twentieth of August, 1866, the President issued his proclamation declaring the rebellion suppressed throughout the whole of the United States of America. 14 Stat. 814. And that day was recognized as the close of the rebellion by

an act of Congress passed March 2, 1867, 14 Stat. 422, c. 145, and by this court in *United States* v. *Anderson,* 9 Wall. 56.

July 4, 1868, the President issued a proclamation of pardon and amnesty to all persons who had directly or indirectly participated in the late rebellion, those under indictment for treason or felony excepted, "for the offence of treason against the United States or of adhering to their enemies during the late civil war, with restoration of all rights of property, except as to slaves and except, also, as to any property of which any person may have been legally divested under the laws of the United States" (15 Stat. 702); and on December 25, 1868, 15 Stat. 711, a proclamation of universal amnesty, unconditionally and without reservation, to all persons who had directly or indirectly participated in the rebellion, "with restoration of all rights, privileges and immunities under the Constitution and the laws which have been made in pursuance thereof."

In the case of *United States* v. *Anderson, supra,* decided at December term, 1869, it was ruled that it was not necessary, under the Abandoned and Captured Property Act, for a party preferring his claim in the Court of Claims, for the proceeds of property taken and sold under it, to prove in addition to his own loyalty the loyalty of the person from whom he bought the property, it having been purchased by him in good faith and without intent to defraud the government or any one else. Mr. Justice Davis, delivering the opinion of the court, said: "During the progress of the war it was expected that our forces in the field would capture property, and, as the enemy retreated, that property would remain in the country without apparent ownership, which should be collected and disposed of. In this condition of things Congress acted. While providing for the disposition of this captured and abandoned property, Congress recognized the status of the loyal Southern people, and distinguished between property owned by them, and the property of the disloyal. It was not required to do this, for all the property obtained in this manner could, by proper proceedings, have been appropriated to the necessities of the war. But Congress did not

think proper to do this. In a spirit of liberality it constituted the government a trustee for so much of this property as belonged to the faithful Southern people, and while directing that all of it should be sold and its proceeds paid into the treasury, gave to this class of persons an opportunity, at any time within two years after the suppression of the rebellion, to bring their suit in the Court of Claims, and establish their right to the proceeds of that portion of it which they owned, requiring from them nothing but proof of loyalty and owner-ship." p. 65.

In *United States* v. *Padelford*, 9 Wall. 531, also decided at December term, 1869, Padelford, the owner of the property, had taken the oath, and secured the benefit of the proclama-tion of pardon issued by President Lincoln, December 8, 1863, 11 Stat. 737, before the property was seized; and it was held that his status as a loyal citizen had been thereby restored, and with it all his rights and property, although he had pre-viously given aid and comfort to the rebellion; and the Chief Justice remarked: "If, in other respects, the petitioner made the proof which, under the act, entitled him to a decree for the proceeds of his property, the law makes the proof of par-don a complete substitute for proof that he gave no aid or comfort to the rebellion."

The act making appropriations for the legislative, executive, and judicial expenses of the government for the year ending June 30, 1871, was passed July 12, 1870, c. 251, 16 Stat. 230, 235, and contained an appropriation of $100,000 for payment of judgments which might be rendered by the Court of Claims, to which a proviso was attached, as follows:

"*Provided*, That no pardon or amnesty granted by the President, whether general or special, by proclamation or otherwise, nor any acceptance of such pardon or amnesty, nor oath taken, or other act performed in pursuance or as a condition thereof, shall be admissible in evidence on the part of any claimant in the Court of Claims as evidence in support of any claim against the United States, or to establish the standing of any claimant in said court, or his right to bring or maintain suit therein; nor shall any such pardon, amnesty,

acceptance, oath, or other act as aforesaid, heretofore offered or put in evidence on behalf of any claimant in said court, be used or considered by said court, or by the appellate court on appeal from said court, in deciding upon the claim of said claimant, or any appeal therefrom, as any part of the proof to sustain the claim of the claimant, or to entitle him to maintain his action in said Court of Claims, or on appeal therefrom; but the proof of loyalty required by the twelfth section of the act of March three, eighteen hundred and sixty-three, entitled 'An act to amend an act to establish a court for the investigation of claims against the United States,' approved February twenty-four, eighteen hundred and fifty-five, and by the third section of the act entitled 'An act to provide for the collection of abandoned property, and for the prevention of frauds in insurrectionary districts within the United States,' approved March twelve, eighteen hundred and sixty-three, and by the third section of the act entitled 'An act to provide for appeals from the Court of Claims, and for other purposes,' approved June twenty-five, eighteen hundred and sixty-eight, shall be made by proof of the matters required by said sections, respectively, irrespective of the effect of any executive proclamation, pardon, amnesty, or other act of condonation or oblivion.

"And in all cases where judgment shall have been heretofore rendered in the Court of Claims in favor of any claimant on any other proof of loyalty than such as is above required and provided, and which is hereby declared to have been and to be the true intent and meaning of said respective acts, the Supreme Court shall, on appeal, have no further jurisdiction of the cause, and shall dismiss the same for want of jurisdiction: *And provided, further,* That whenever any pardon shall have heretofore been granted by the President of the United States to any person bringing suit in the Court of Claims for the proceeds of abandoned or captured property under the said act approved March twelve, eighteen hundred and sixty-three, and the acts amendatory of the same, and such pardon shall recite, in substance, that such person took part in the late rebellion against the government of the United States, or was guilty of any act of rebellion against or disloyalty to the

United States, and such pardon shall have been accepted in writing, by the person to whom the same issued, without an express disclaimer of and protestation against such fact of guilt contained in such acceptance, such pardon and acceptance shall be taken and deemed in such suit in the said Court of Claims, and on appeal therefrom, conclusive evidence that such person did take part in and give aid and comfort to the late rebellion, and did not maintain true allegiance or consistently adhere to the United States; and on proof of such pardon and acceptance, which proof may be heard summarily on motion or otherwise, the jurisdiction of the court in the case shall cease, and the court shall forthwith dismiss the suit of such claimant."

At December term, 1871, in the case of *United States* v. *Klein*, 13 Wall. 128, which was a case decided by the Court of Claims, May 26, 1869; and pending here on appeal filed herein December 11, 1869, this court held, the Chief Justice delivering the opinion, that the Captured and Abandoned Property Act did not confiscate, or in any case absolutely divest, the property of the original owner, even though disloyal, and that by the seizure the government constituted itself a trustee for those who were entitled or whom it should thereafterwards recognize as entitled; that persons who had faithfully accepted the provisions offered by the proclamation of pardon of December 8, 1863, became entitled to the proceeds of their property thus paid into the treasury, on application within two years from the close of the war; and that the proviso in question was unconstitutional and void, its substance being that an acceptance of a pardon without a disclaimer should be conclusive evidence of the acts pardoned, but should be null and void as evidence of rights conferred by it, both in the Court of Claims and in this court; that the proviso denied to pardons granted by the President the effect which this court had adjudged them to have; that the denial of jurisdiction to this court as well as the Court of Claims was founded solely on the application of a rule of decision, in causes pending, prescribed by Congress, amounting to a rule for the decision of a cause in a particular way; and that the proviso invaded

the powers both of the judicial and executive departments of the government. Mr. Justice Miller and Mr. Justice Bradley dissented, on the ground that, although they agreed that the proviso was unconstitutional, they could not concur in the proposition that under the Captured and Abandoned Property Act there remained " in the former owner, who had given aid and comfort to the rebellion, any interest whatever in the property or its proceeds when it had been sold and paid into the Treasury or had been converted to the use of the public under that act." This was followed by *Mrs. Armstrong's Case*, 13 Wall. 154, and *Pargoud's Case*, 13 Wall. 156.

In *Carlisle's Case*, 16 Wall. 147, 153, December term, 1872, Mr. Justice Field, speaking for the court, after referring to the foregoing cases, observed:

" After these repeated adjudications, it must be regarded as settled in this court that the pardon of the President, whether granted by special letters or by general proclamation, relieves claimants of the proceeds of captured and abandoned property from the consequences of participation in the rebellion, and from the necessity of establishing their loyalty in order to prosecute their claims. This result follows whether we regard the pardon as effacing the offence, blotting it out, in the language of the cases, as though it had never existed, or regard persons pardoned as necessarily excepted from the general language of the act, which requires claimants to make proof of their adhesion, during the rebellion, to the United States. It is not to be supposed that Congress intended by the general language of the act to encroach upon any of the prerogatives of the President, and especially that benign prerogative of mercy which lies in the pardoning power. It is more reasonable to conclude that claimants, restored to their rights of property, by the pardon of the President, were not in contemplation of Congress in passing the act, and were not intended to be embraced by the requirement in question. All general terms in statutes should be limited in their application, so as not to lead to injustice, oppression, or any unconstitutional operation, if that be possible. It will be presumed that exceptions were intended which would avoid results of that nature."

In *Haycraft* v. *United States*, 22 Wall. 81, 92, it was held, at October term, 1874, that under the provision of the act of March 12, 1863, that any person claiming to be the owner of captured or abandoned property might "at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims, and, on proof . . . that he has never given any aid or comfort to the present rebellion," receive the proceeds of the sale of such property, a person who had given aid and comfort to the rebellion and who had not been pardoned until after two years from the suppression of the rebellion could not, on then preferring his petition, obtain the benefit of the act, even though in cases generally the limitation of actions in that court was one of six years; that the question was not one of limitation but of jurisdiction, and that the inability of an unpardoned rebel to sue in the Court of Claims did not control the operation of the statute. The court said, through Mr. Chief Justice Waite: "A sovereign cannot be sued in his own courts, except with his consent. This is an action against the United States in its own Court of Claims. The appellant must, therefore, show that consent has been given to its prosecution. That being done, the jurisdiction of the court is established and he may proceed. Otherwise, not." The Chief Justice pointed out that the required consent was not contained in the Captured and Abandoned Property Act itself, for the only action there consented to was one to be commenced within two years after the suppression of the rebellion, and that such consent could not be found in the provision of the act of March 3, 1863, reorganizing the Court of Claims, c. 92, 12 Stat. 765, 767, that the court might determine all claims "founded upon . . . any contract express or implied with the government of the United States," unless there was an implied promise by the United States to pay to every owner of captured or abandoned property, whether loyal or disloyal, the proceeds of his property taken and sold. But that involved the assumption that the Captured and Abandoned Property Act contained an undertaking by the United States, at that time, to receive and hold the property, or its proceeds if sold,

in trust for the use and benefit of the owner, whoever he might be, and that the trust in favor of the owner having then been created, the remedy for its enforcement in the Court of Claims as a contract was restored to a disloyal owner by the operation of the President's proclamation. Now, the statute was a war measure, and embraced private property abandoned by its owner or liable to capture, and the capture of cotton was legitimate under the circumstances. *Mrs. Alexander's Cotton,* 2 Wall. 404, 419. As, however, friends as well as foes might suffer in the indiscriminate seizure likely to follow the authority given, it was provided that any owner might, within two years after the suppression of the rebellion, prefer his claim, and upon proof of his ownership and loyalty receive the money realized by the United States. Under the ruling in *Klein's case* the effect of the act was to provide a reward for submission to the government and the acceptance of amnesty, as well as authority for the seizure of the property, and, according to the doctrine of that case, if a suit was commenced within two years, a pardoned enemy could recover as well as a loyal friend, but the commencement of the suit within the prescribed time was a condition precedent to the ultimate relief. There was no promise, except to such as should commence the suit in time, and upon the trial be in a condition to bring themselves within the requirements of the act. The promise was express and there was no room left for implication. Both the right to persons to demand and receive a restoration of their property taken, and the remedy by which that right was to be enforced, were created by the same statute, and in such cases the remedy afforded was exclusive of all others. That remedy was the only one of which the Court of Claims, or any other court, had been authorized to take jurisdiction, and as the claimant had neglected to avail himself of that remedy, he was consequently without any, and the Court of Claims was right in concluding that it had no jurisdiction.

In *Knote* v. *United States,* certain personal property of the claimant had been seized, libelled, condemned, and forfeited by the decree of a District Court, on the ground of his treason,

and the proceeds paid into the treasury prior to the proclamation of December 25, 1868, after which claimant brought suit for the proceeds, relying on that proclamation, but the Court of Claims, 10 C. Cl. 397, decided that he was not entitled to recover, and dismissed the petition. The judgment was affirmed by this court at October term, 1877. *Knote* v. *United States*, 95 U. S. 149. It was held that the general pardon and amnesty granted by the proclamation of December 25, 1868, did not entitle one receiving their benefits to the proceeds of his property previously condemned and sold under the confiscation act of July 17, 1862, after such proceeds had been paid into the treasury of the United States; although a full pardon released the offender from all penalties imposed by the offence pardoned, and restored to him all his civil rights, it did not affect any rights which were vested in others directly by the execution of the judgment for the offence, or which had been acquired by others whilst that judgment was in force. And if the proceeds of the property of the offender had been paid into the treasury, the right to them had so far become vested in the United States that they could only be recovered by him through an act of Congress. Moneys once in the treasury could only be withdrawn by an appropriation by law.

Mr. Justice Field, announcing the decision, referred, among other cases, to *Osborn* v. *United States*, 91 U. S. 474, and said: " An attempt is made by counsel to give some expressions used in the opinion of the court a wider meaning, so as to support the claim here presented; but the language will not sustain the conclusion sought. There was no consideration of the effect of the pardon upon the proceeds of the forfeited property when paid into the Treasury, but only of its effect upon those proceeds whilst under the control of the court in its registry. Any language which seemingly admits of a broader interpretation must be restricted to the facts of the case. There was no intention of expressing any opinion that a pardon could do away with the constitutional requirement as to money in the Treasury; whilst there, it is the property of the United States. . . . The claim here presented rests

upon a supposed implied contract to pay to the claimant the money received as the proceeds of the forfeited property. To constitute such a contract, there must have been some consideration moving to the United States; or they must have received the money, charged with a duty to pay it over; or the claimant must have had a lawful right to it when it was received, as in the case of money paid by mistake."

In *Hart* v. *United States*, 118 U. S. 62, it was decided on appeal from the Court of Claims, (adjudged there June 7, 1880, and, on rehearing, May 16, 1881,) that that court, which had found the claimant to be a person who had "sustained the late rebellion," and that the claim accrued before April 13, 1861, did not err in deciding that it had no jurisdiction to proceed to judgment, as the payment of such a claim was forbidden by joint resolution No. 46, approved March 2, 1867, 14 Stat. 571; that although before the joint resolution was passed the claimant had received from the President a pardon "for all offences committed by him arising from participation, direct or implied, in the rebellion," the pardon did not authorize the payment of the claim, nor did the joint resolution take away anything which the pardon had conferred; and that it was entirely within the competency of Congress to declare that the claims mentioned in the joint resolution should not be paid until the further order of Congress.

On the same day that the Austin act was passed, March 3, 1882, an act entitled "An act to afford assistance and relief to Congress and the executive departments in the investigation of claims and demands against the government," c. 116, 22 Stat. 485, was approved, of which the fourth section was as follows: "Sec. 4. In any case of a claim for supplies or stores taken by or furnished to any part of military or naval forces of the United States for their use during the late war for the suppression of the rebellion, the petition shall aver that the person who furnished such supplies or stores, or from whom such supplies or stores were taken, did not give any aid or comfort to said rebellion, but was throughout that war loyal to the government of the United States, and the fact of such loyalty shall be a jurisdictional fact; and unless the said court

shall, on a preliminary inquiry, find that the person who furnished such supplies or stores, or from whom the same were taken as aforesaid, was loyal to the government of the United States throughout said war, the courts shall not have jurisdiction of said cause, but the same shall, without further proceedings, be dismissed."

Twenty years after the passage of the Captured and Abandoned Property Act; nearly fifteen years after the close of the rebellion and the proclamations of amnesty ; twelve years after the decision of Klein's, Armstrong's, and Pargoud's cases; eighteen years after the conversion of the cotton for whose proceeds the suit was brought; fifteen years after the proceeds were covered into the Treasury ; and nearly four years after the death of Austin, the act proceeded on was passed. Referring to Austin's neglect to sue, the Court of Claims remarked : " This court was open to him until August 20, 1868; ready to adjudicate the claim, in the freshness of the memory of witnesses, then living, and able to testify with absolute certainty. . . . From the facts and circumstances, indicated by the proof, we conclude that the decedent was embarrassed by his inability to establish in this court his adherence to the United States, as required by law ; and from that embarrassment originates his failure to prosecute his case within this jurisdiction." Loyal or not, he did not bring suit within the time prescribed by either of the acts of 1863, and if disloyal, whether his transgression was obliterated by the proclamation of July 4, or that of December 25, 1868, was not important.

Since it cannot be controverted that it is for Congress to determine when and under what circumstances the government may be sued, and that the Court of Claims has the right to entertain jurisdiction of cases against the United States and proceed to judgment only by virtue of acts of Congress granting such jurisdiction, and is limited precisely to such cases both in regard to parties and the cause of action as Congress has prescribed, *De Groot* v. *United States*, 5 Wall. 419, 431, the inquiry is, whether this suit can be sustained under the act authorizing it to be commenced, on the theory that loyalty in fact was not a condition to the exercise of jurisdiction, and,

on the merits, was rendered immaterial by the general amnesty. The act, c. 111, 22 Stat. 804, reads as follows:

"That the claims of the successors in interest and legal representatives of Sterling T. Austin, deceased, late of the parish of Carroll, in the State of Louisiana, for cotton taken by the military and civil authorities of the United States, or by either of them, during the years eighteen hundred and sixty-three, eighteen hundred and sixty-four, and eighteen hundred and sixty-five, in the States of Louisiana and Texas, be, and the same are hereby, referred to the Court of Claims, with full jurisdiction and power in the said court to adjust and settle such claims, and to render a judgment in said cause for the net amount realized by the United States from the sale of such cotton as shall appear from the evidence to have been so taken by said authorities; and in such action the said representatives shall be entitled to recover as aforesaid, any statute of limitation to the contrary notwithstanding : *Provided, however,* That it be shown to the satisfaction of the court that neither Sterling T. Austin, senior, nor any of his surviving representatives gave any aid or comfort to the late rebellion, but were throughout the war loyal to the government of the United States."

In *Voorhees* v. *Bank of the United States*, 10 Pet. 449, 471, certain acts required to be done previous to a sale were prescribed by a proviso, and were held to be conditions precedent, it being stated by Mr. Justice Baldwin that the effect of a proviso in deeds and laws is to declare that the grant made shall not operate, or the authority conferred shall not be exercised, unless in the case provided.

"The office of a proviso, generally," said Mr. Justice Story in *Minis* v. *United States*, 15 Pet. 423, 445, "is either to except something from the enacting clause or to qualify or restrain its generalities, or to exclude some possible ground of misinterpretation of it, as extending to cases not intended by the legislature to be brought within its purview."

While we concede that the law does not attach a fixed and invariable meaning to a proviso, we think it clear that this proviso negatived the authority granted beyond the limit

defined.  It operated upon the entire enacting clause, and
made loyalty a jurisdictional fact, since the consent to the
prosecution of the suit was given upon the condition that that
fact should be established.  The Court of Claims was vested
with jurisdiction to adjust the claim and render judgment,
and the representatives of Austin were declared entitled to
recover. notwithstanding the two-year or the six-year bar,
provided Austin were shown to the satisfaction of the court
not to have given any aid or comfort to the late rebellion,
and to have been loyal throughout the war to the government
of the United States, and not otherwise, and the effect of the
proviso cannot be confined to the right of recovery merely.

Congress in making this requirement in no respect attempted
to defeat the operation of the President's proclamation of
fifteen years before, which could not control the power of Con-
gress in the matter of giving or withholding jurisdiction.   In
declining to bestow jurisdiction in favor of pardoned offenders,
whose claims were barred, Congress did not deny its proper
constitutional effect to amnesty.   To whom the privilege of
suit should be accorded was for Congress alone to determine.

It is contended that the words in reference to the establish-
ment of loyalty are in substance the same as those used in the
third section of the Captured and Abandoned Property Act,
and that Congress must be held to have employed them in the
Austin act in view of the interpretation of the former act by
the decisions of the courts of the United States, and that that
interpretation became as much a part of the Austin act as if
written out there.   If this were so, it would be difficult to
assign any reason for the insertion of the proviso so far as
Austin was concerned, for it would be made to read, provided,
however, that it be shown to the satisfaction of the court that
Austin was loyal in fact, although the amnesty proclamations
have rendered that immaterial.

But it is not so.  Undoubtedly Congress framed this act
with due regard to the state of decision under the prior act,
and hence, instead of making proof of loyalty an integral part
of claimant's case with his ownership of the property and his
right to the proceeds, as in the Captured and Abandoned Prop-

erty Act, it made the establishment of loyalty in fact, as contradistinguished from innocence in law produced by pardon, a prerequisite to jurisdiction. Consent to be sued was given only on this condition.

Nor do we perceive any ground for imputing the intention to Congress to revive the Captured and Abandoned Property Act for the purposes of this action. This is not the case of the revival of a law by express reënactment, or by the repeal of a repealing clause; and if such had been the intention of Congress, no reason suggests itself why Congress should not have unequivocally said so.

Again it is argued that because in the fourth section of the general act of March 3, 1883, the fact of loyalty was stated to be "a jurisdictional fact," therefore the proviso of the Austin act should not be construed to have that effect, because, while the same language was used as to the existence of loyalty, its establishment was not in terms expressed to be jurisdictional. But the structure of the two acts was different and required different treatment, and the special act cannot properly be construed as if it were a general act and part of a general system and the change of phraseology in this particular significant. On the contrary, as we have no doubt that the effect of the proviso is such as we have attributed to it, we think the argument for the Government not unreasonable that Congress, in employing the same language in both acts as to the condition of loyalty, did so in effectuation of a common object to be attained by the requirement.

As the President's proclamation could neither give jurisdiction to nor take it away from the Court of Claims, and Congress had the power to determine what classes of persons should be recognized in that court, and over what claims its jurisdiction should be exercised, we are of opinion that the court rightly held it to be its duty to determine as a preliminary question whether the decedent had given any aid or comfort to the late rebellion or was loyal throughout the war to the government of the United States, and, having found that he was not thus loyal, properly dismissed the petition.

*Judgment affirmed.*