# Congressional Requests for Confidential Executive Branch Information

This memorandum summarizes the principles and practices governing congressional requests for confidential executive branch information.

June 19, 1989

MEMORANDUM OPINION FOR THE
GENERAL COUNSEL'S CONSULTATIVE GROUP

This memorandum summarizes the principles and practices governing congressional requests for confidential executive branch information. As discussed below, the executive branch's general practice has been to attempt to accommodate whatever legitimate interests Congress may have in obtaining the information, while, at the same time, preserving executive branch interests in maintaining essential confidentiality. Only when the accommodation process fails to resolve a dispute and a subpoena is issued does it become necessary for the President to consider asserting executive privilege.

## I. Congress' Oversight Authority

The constitutional role of Congress is to adopt general legislation that will be implemented — "executed" — by the executive branch. The courts have recognized that this general legislative interest gives Congress investigatory authority. Both Houses of Congress have power, "through [their] own process, to compel a private individual to appear before it or one of its committees and give testimony needed to enable it efficiently to exercise a legislative function belonging to it under the Constitution." *McGrain v. Daugherty*, 273 U.S. 135, 160 (1927). The issuance of subpoenas in aid of this function "has long been held to be a legitimate use by Congress of its power to investigate," *Eastland v. United States Serviceman's Fund*, 421 U.S. 491, 504 (1975), provided that the investigation is "related to, and in furtherance of, a legitimate task of the Congress." *Watkins v. United States*, 354 U.S. 178, 187 (1957). The inquiry must pertain to subjects "on which legislation could be had." *McGrain v. Daugherty*, 273 U.S. at 177. Thus, Congress' oversight authority

153

is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution.

Broad as it is, the power is not, however, without limitations. Since Congress may only investigate into those areas in which it may potentially legislate or appropriate, it cannot inquire into matters which are within the exclusive province of one of the other branches of the Government.

*Barenblatt v. United States*, 360 U.S. 109, 111-12 (1959).

## II. Executive Privilege

If it is established that Congress has a legitimate legislative purpose for its oversight inquiry, the executive branch's interest in keeping the information confidential must be assessed. This subject is usually discussed in terms of "executive privilege," and that convention is used here. The question, however, is not strictly speaking just one of executive privilege. While the considerations that support the concept and assertion of executive privilege apply to any congressional request for information, the privilege itself need not be claimed formally vis-a-vis Congress except in response to a lawful subpoena; in responding to a congressional request for information, the executive branch is not necessarily bound by the limits of executive privilege.

Executive privilege is constitutionally based. To be sure, the Constitution nowhere expressly states that the President, or the executive branch generally, enjoys a privilege against disclosing information requested by the courts, the public, or the legislative branch. The existence of such a privilege, however, is a necessary corollary of the executive function vested in the President by Article II of the Constitution.[1] It has been asserted by numerous Presidents from the earliest days of our Nation, and it was explicitly recognized by the Supreme Court in *United States v. Nixon*, 418 U.S. 683, 705-06 (1974).

There are at least three generally-recognized components of executive privilege: state secrets, law enforcement, and deliberative process. Since most disputes with Congress in this area in recent years have concerned the privilege for executive branch deliberations, this memorandum will focus on that component. *See generally Confidentiality of the Attorney General's Communications in Counseling the President*, 6 Op. O.L.C. 481, 484-90 (1982).

---

[1] The privilege to withhold information is implicit in the scheme of Article II and particularly in the provisions that "[t]he executive Power shall be vested in a President of the United States of America," U S Const. art. II, § 1, cl. 1, and that the President shall "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

154

The first congressional request for information from the executive branch occurred in 1792, in the course of a congressional investigation into the failure of an expedition under the command of one General St. Clair. President Washington called his Cabinet together to consider his response, stating that he could conceive that there might be papers of so secret a nature that they ought not be given up. The President and his Cabinet concluded "that the Executive ought to communicate *such papers as the public good would permit*, and ought to refuse those, *the disclosure of which would injure the public.*" 1 *Writings of Thomas Jefferson* 304 (1903) (emphasis added). While President Washington ultimately determined in the St. Clair case that the papers requested could be furnished without injury to the public, he refused four years later to comply with a House committee's request for copies of instructions and other documents employed in connection with the negotiation of a treaty with Great Britain.

The practice of refusing congressional requests for information, on the ground that the national interest would be harmed by the disclosure, was employed by many Presidents in the ensuing years. *See generally History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress, Part I - Presidential Invocations of Executive Privilege Vis-a-Vis Congress*, 6 Op. O.L.C. 751 (1982). The privilege was most frequently asserted in the areas of foreign affairs and military and national security secrets; it was also invoked in a variety of other contexts, including executive branch investigations. In 1954, in instructing the Secretary of Defense concerning a Senate investigation, President Eisenhower asserted that the privilege extends to deliberative communications within the executive branch:

> Because it is essential to efficient and effective administration that employees of the Executive Branch be in a position to be completely candid in advising with each other on official matters, and because it is not in the public interest that any of their conversations or communications, or any documents or reproductions, concerning such advice be disclosed, you will instruct employees of your Department that in all of their appearances before the Subcommittee of the Senate Committee on Government Operations regarding the inquiry now before it they are not to testify to any such conversations or communications or to produce any such documents or reproductions.

*Pub. Papers of Dwight D. Eisenhower* 483-84 (1954).

The Supreme Court has recognized that the Constitution gives the President the power to protect the confidentiality of executive branch deliberations. *See generally Nixon v. Administrator of Gen. Servs.*, 433

155

U.S. 425, 446-55 (1977). This power is independent of the President's power over foreign affairs, national security, or law enforcement; it is rooted instead in "the necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *United States v. Nixon*, 418 U.S. at 708.

It necessarily follows — and the Supreme Court so held in *United States v. Nixon* — that communications among the President and his advisers enjoy "a presumptive privilege" against disclosure in court. *Id.*[2] The reasons for this privilege, the *Nixon* Court explained, are "plain." "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Id.* at 705. Often, an adviser's remarks can be fully understood only in the context of a particular debate and of the positions others have taken. Advisers change their views, or make mistakes which others correct; this is indeed the purpose of internal debate. The result is that advisers are likely to be inhibited if they must anticipate that their remarks will be disclosed to others, not party to the debate, who may misunderstand the significance of a particular statement or discussion taken out of context. Some advisers may hesitate — out of self-interest — to make remarks that might later be used against their colleagues or superiors. As the Court stated, "[a] president and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." *Id.* at 708.

These reasons for the constitutional privilege have at least as much force when it is Congress, instead of a court, that is seeking information. The possibility that deliberations will be disclosed to Congress is, if anything, more likely to chill internal debate among executive branch advisers. When the Supreme Court held that the need for presidential communications in the criminal trial of President Nixon's close aides outweighed the constitutional privilege, an important premise of its decision was that it did not believe that "advisers will be moved to temper the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution." *Id.* at 712. By contrast, congressional requests for executive branch deliberative information are anything but infrequent.

---

[2] The *Nixon* Court explained that the privilege is constitutionally based:

> [T]he privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional underpinnings.

418 U.S. at 705-06 (footnote omitted). The Court also acknowledged that the privilege stems from the principle of separation of powers: "The privilege is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." *Id* at 708.

Moreover, compared to a criminal prosecution, a congressional investigation is usually sweeping; its issues are seldom narrowly defined, and the inquiry is not restricted by the rules of evidence. Finally, when Congress is investigating, it is by its own account often in an adversarial position to the executive branch and initiating action to override judgments made by the executive branch. This increases the likelihood that candid advice from executive branch advisers will be taken out of context or misconstrued. For all these reasons, the constitutional privilege that protects executive branch deliberations against judicial subpoenas must also apply, perhaps even with greater force, to Congress' demands for information.

The United States Court of Appeals for the District of Columbia Circuit has explicitly held that the privilege protects presidential communications against congressional demands. During the Watergate investigation, the Court of Appeals rejected a Senate committee's efforts to obtain tape recordings of conversations in President Nixon's offices. The court held that the tapes were constitutionally privileged and that the committee had not made a strong enough showing to overcome the privilege. *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725 (D.C. Cir. 1974) (*en banc*). Indeed, the court held that the committee was not entitled to the recordings unless it showed that "the subpoenaed evidence is *demonstrably critical* to the responsible fulfillment of the Committee's functions." *Id.* at 731 (emphasis added).[3]

Finally, history is replete with examples of the executive's assertion of privilege in the face of congressional requests for deliberative process information. We have previously recounted the incidents in which Presidents, beginning with President Washington, have withheld from Congress documents that reflected deliberations within the executive branch. *History of Refusals by Executive Branch Officials to Provide Information Demanded by Congress, Part II - Invocations of Executive Privilege by Exective Officials*, 6 Op. O.L.C. 782 (1982).

## III. Accommodation Process

Where Congress has a legitimate need for information that will help it legislate, and the executive branch has a legitimate, constitutionally recognized need to keep certain information confidential, at least one court

---

[3] The Supreme Court has assumed that the constitutional privilege protects executive branch deliberations against Congress to some degree. *See United States v Nixon*, 418 U S at 712 n 19. Moreover, the Court held in *Administrator of General Services*, that the constitutional privilege protects executive branch deliberations from disclosure to members of the *same* branch in a later administration, the Court rejected the specific claim of privilege in the case not because the privilege was inapplicable but because the intrusion was limited and the interests justifying the intrusion were strong and nearly unique. *See* 433 U S at 446-55. Since the Court has held that the privilege protects executive branch communications against compelled disclosure to the judicial branch and to later members of the executive branch, there is every reason to believe that the Court would hold that it protects against compelled disclosure to Congress

has referred to the obligation of each branch to accommodate the legitimate needs of the other. This duty to accommodate was described by the D.C. Circuit in a case involving a House committee's request to a private party for information which the executive branch believed should not be disclosed. The court said:

> The framers ... expect[ed] that where conflicts in scope of authority arose between the coordinate branches, a spirit of dynamic compromise would promote resolution of the dispute in the manner most likely to result in efficient and effective functioning of our governmental system. Under this view, the coordinate branches do not exist in an exclusively adversary relationship to one another when a conflict in authority arises. Rather, each branch should take cognizance of an implicit constitutional mandate to seek optimal accommodation through a realistic evaluation of the needs of the conflicting branches in the particular fact situation.

> ....

> [Because] it was a deliberate feature of the constitutional scheme to leave the allocation of powers unclear in certain situations, the resolution of conflict between the coordinate branches in these situations must be regarded as an opportunity for a constructive *modus vivendi*, which positively promotes the functioning of our system. The Constitution contemplates such accommodation. Negotiation between the two branches should thus be viewed as a dynamic process affirmatively furthering the constitutional scheme.

*United States v. AT&T*, 567 F.2d 121, 127, 130 (D.C. Cir. 1977) (footnotes omitted).

In an opinion he issued in connection with a 1981 executive privilege dispute involving a committee of the House of Representatives and the Department of Interior, Attorney General William French Smith captured the essence of the accommodation process:

> The accommodation required is not simply an exchange of concessions or a test of political strength. It is an obligation of each branch to make a principled effort to acknowledge, and if possible to meet, the legitimate needs of the other branch.

*Assertion of Executive Privilege in Response to a Congressional Subpoena*, 5 Op. O.L.C. 27, 31 (1981) ("Smith Opinion").

The process of accommodation requires that each branch explain to the other why it believes its needs to be legitimate. Without such an explanation, it may be difficult or impossible to assess the needs of one branch and relate them to those of the other. At the same time, requiring such an explanation imposes no great burden on either branch. If either branch has a reason for needing to obtain or withhold information, it should be able to express it.

The duty of Congress to justify its requests not only arises directly from the logic of accommodation between the two branches, but it is established in the case law as well. In *United States v. Nixon*, the Supreme Court emphasized that the need for evidence was articulated and specific. 418 U.S. at 700-02, 713. Even more to the point is *Senate Select Committee on Presidential Campaign Activities*. In that case, the D.C. Circuit stated that the sole question was "whether the subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions." 498 F.2d at 731. The court held that the Committee had not made a sufficient showing. It pointed out that the President had already released transcripts of the conversations of which the Committee was seeking recordings. The Committee argued that it needed the tape recordings "in order to verify the accuracy of" the transcripts, to supply the deleted portions, and to gain an understanding that could be acquired only by hearing the inflection and tone of voice of the speakers. *Id.* at 723-33. But the court answered that, in order to legislate, a committee of Congress seldom needs a "precise reconstruction of past events." *Id.* at 732. The court concluded:

> The Committee has ... shown no more than that the materials deleted from the transcripts may possibly have some arguable relevance to the subjects it has investigated and to the areas in which it may propose legislation. It points to no specific legislative decisions that cannot responsibly be made without access to materials uniquely contained in the tapes or without resolution of the ambiguities that the transcripts may contain.

*Id.* at 733. For this reason, the court stated, "the need demonstrated by the Select Committee ... is too attenuated and too tangential to its functions" to override the President's constitutional privilege. *Id.*

*Senate Select Committee* thus establishes Congress' duty to articulate its need for particular materials — to "point[] to ... specific legislative decisions that cannot responsibly be made without access to materials uniquely contained in" the privileged document it has requested. Moreover, this case suggests that Congress will seldom have any legitimate legislative interest in knowing the precise predecisional positions and statements of particular executive branch officials. When Congress demands such information, it must explain its need carefully and convincingly.

It is difficult to generalize about the kind of accommodation with respect to deliberative process information that may be appropriate in particular cases. Whether to adhere to the consistent general policy of confidentiality for such information will depend on the facts of the specific situation. Certain general principles do apply, however. As Attorney General Smith explained in advising President Reagan:

> [T]he interest of Congress in obtaining information for oversight purposes is ... considerably weaker than its interest when specific legislative proposals are in question. At the stage of oversight, the congressional interest is a generalized one of ensuring that the laws are well and faithfully executed and of proposing remedial legislation if they are not. The information requested is usually broad in scope and the reasons for the request correspondingly general and vague. In contrast, when Congress is examining specific proposals for legislation, the information which Congress needs to enable it to legislative effectively is usually quite narrow in scope and the reasons for obtaining that information correspondingly specific. A specific, articulated need for information will weigh substantially more heavily in the constitutional balancing than a generalized interest in obtaining information.

Smith Opinion, 5 Op. O.L.C. at 30. Moreover, Attorney General Smith explained, information concerning ongoing deliberations need rarely be disclosed:

> [T]he congressional oversight interest will support a demand for predecisional, deliberative documents in the possession of the Executive Branch only in the most unusual circumstances. It is important to stress that congressional oversight of Executive Branch actions is justifiable only as a means of facilitating the legislative task of enacting, amending, or repealing laws. When such "oversight" is used as a means of participating directly in an ongoing process of decisionmaking within the Executive Branch, it oversteps the bounds of the proper legislative function. Restricted to its proper sphere, the congressional oversight function can almost always be properly conducted with reference to information concerning decisions which the Executive Branch has already reached. Congress will have a legitimate need to know the preliminary positions taken by Executive Branch officials during internal deliberations only in the rarest of circumstances. Congressional demands, under the

160

guise of oversight, for such preliminary positions and delib-
erative statements raise at least the possibility that the
Congress has begun to go beyond the legitimate oversight
function and has impermissibly intruded on the Executive
Branch's function of executing the law. At the same time,
the interference with the President's ability to execute the
law is greatest while the decisionmaking process is ongoing.

*Id.* at 30-31.

## IV. Procedures

President Reagan's November 4, 1982 Memorandum for the Heads of
Executive Departments and Agencies on "Procedures Governing
Responses to Congressional Requests for Information" ("Reagan
Memorandum") sets forth the long-standing executive branch policy in
this area:

> The policy of this Administration is to comply with Con-
> gressional requests for information to the fullest extent
> consistent with the constitutional and statutory obligations
> of the Executive Branch.... [E]xecutive privilege will be
> asserted only in the most compelling circumstances, and
> only after careful review demonstrates that assertion of the
> privilege is necessary. Historically, good faith negotiations
> between Congress and the executive branch have mini-
> mized the need for invoking executive privilege, and this
> tradition of accommodation should continue as the prima-
> ry means of resolving conflicts between the Branches.

Reagan Memorandum at 1. The Reagan Memorandum also sets forth the
procedures for asserting executive privilege in response to a congres-
sional request for information. Under the terms of the Memorandum, an
agency must notify and consult with the Attorney General, through the
Assistant Attorney General for the Office of Legal Counsel, as soon as it
determines that compliance with the request raises a "substantial ques-
tion of executive privilege." The Memorandum further provides that
executive privilege cannot be asserted without specific authorization by
the President, based on recommendations made to him by the concerned
agency head, the Attorney General, and the Counsel to the President.

In practice, disputes with Congress in this area typically commence
with an informal oral or written request from a congressional committee
or subcommittee for information in the possession of the executive
branch. Most such requests are honored promptly; in some cases, how-
ever, the executive branch official may resist supplying some or all of the

requested information either because of the burden of compliance or because the information is of a sensitive nature. The executive branch agency and the committee staff will typically negotiate during this period to see if the dispute can be settled in a manner acceptable to both sides. In most cases this accommodation process is sufficient to resolve any dispute. On occasion, however, the process breaks down, and a subpoena is issued. At that point, if further negotiation is unavailing, it is necessary to consider asking the President to assert executive privilege.

If after assertion of executive privilege the committee remains unsatisfied with the agency's response, it may vote to hold the agency head in contempt of Congress. If the full Senate or House of Representatives then votes to hold the official in contempt, it might attempt to impose sanctions by one of three methods. First, it might refer the matter to a United States Attorney for reference to a grand jury. *See* 2 U.S.C. §§ 192, 194. Second, the Sergeant-at-Arms theoretically could be dispatched to arrest the official and detain him in the Capitol; if this unlikely event did occur, the official would be able to test the legality of this detention through a habeas corpus petition, thereby placing in issue the legitimacy of his actions in refusing to disclose the subpoenaed information. Third, and the most likely option due to legal and practical difficulties associated with the first two options, the Senate or House might bring an action in court to obtain a judicial order requiring compliance with the subpoena and contempt of court enforcement orders if the court's order is defied.

WILLIAM P. BARR
*Assistant Attorney General*
*Office of Legal Counsel*