## C. A. WEED & CO. v. LOCKWOOD, U. S. Atty.

(Circuit Court of Appeals, Second Circuit. May 26, 1920.)

No. 245.

1. **Injunction** ⊂⊃**105 (2)—District attorney can be restrained from prosecuting under Lever Act, if it is unconstitutional.**

If the Lever Food Control Act, as amended by Act Oct. 22, 1919, making unlawful unreasonable charges for necessaries, is unconstitutional, prosecutions against a dealer in wearing apparel for making numerous daily sales would deprive him of property, so that such prosecution can be restrained.

2. **War** ⊂⊃**4, 33—Peace treaty not being ratified, state of war continued, so as to authorize Lever Act under war powers.**

At the time of the national enactment of the amendment to Lever Food Control Act on October 22, 1919, the Senate having failed to ratify the peace treaty with Germany, the state of war continued, and the emergency created thereby was still in existence, so that the amendment of that act to issue an adequate supply and adequate distribution of necessaries, in view of scarcity caused by the war, was sustainable under the war powers of Congress.

3. **War** ⊂⊃**4—Prohibition of unreasonable charges for wearing apparel within war powers.**

Control of the sale and distribution of wearing apparel by the amendment to the Lever Food Control Act of October 22, 1919, was a proper subject for war legislation, so that Congress could legislate on such subjects under the authority of its war powers, without contravening Const. art. 1, § 8, cl. 18.

4. **Constitutional law** ⊂⊃**258—Criminal law** ⊂⊃**13—Prohibition of unreasonable charges not too indefinite to inform accused of crime or violative of due process of law.**

The amendment of the Lever Food Control Act of October 22, 1919, so as to include wearing apparel within the act, and to make unlawful unreasonable charges for necessaries therein defined, did not violate Const. Amend. 6, giving accused the right to be informed of the accusation against him, or Amendment 5, requiring due process of law, though the determination of what is a reasonable charge is left to the jury.

5. **Constitutional law** ⊂⊃**242—Exemption of farmers from Lever Act not discriminatory.**

Provision of the Lever Food Control Act as amended October 22, 1919, exempting farmers from the act with respect to charges for products raised by them does not discriminate contrary to Constitution, since there was reason for exempting farmers in order to encourage increased production by them.

6. **Constitutional law** ⊂⊃**48—Classification must be obviously arbitrary to render statute unconstitutional.**

The power of classification enacting legislation has a very broad range, and the classification must be palpably arbitrary to authorize judicial review.

7. **War** ⊂⊃**4—Failure of President to issue orders fixing prices does not prevent prosecution for unreasonable charges.**

The failure of the President to issue order fixing prices for certain necessaries as authorized by the Lever Food Control Act, § 1, does not prevent prosecution of a dealer for charging unreasonable prices for necessaries.

Ward, Circuit Judge. dissenting in part.

---

Appeal from the District Court of the United States for the Western District of New York.

Bill in equity filed by· C. A. Weed & Co. against Stephen T. Lockwood, United States Attorney for the Western District of New York, defendant, to restrain and enjoin the defendant from taking any further proceedings upon and subsequent to the indictment against the plaintiff pending in the District Court, and from bringing the plaintiff to trial under said indictment, and to restrain the defendant from instituting any further prosecution under the act of Congress of August 10, 1917, as amended by the act approved October 22, 1919 (41 Stat. 297, c. 80). From an order (264 Fed. 453) denying an interlocutory injunction, plaintiff appeals. Affirmed.

Edward L. Jellinek and Simon Fleischmann, both of Buffalo, N. Y., for appellant.

Daniel J. Kenefick, Louis E. Desbecker, and Almon W. Lytle, all of Buffalo, N. Y., for Buffalo Retail Merchants' Ass'n; James O. Moore and Emil Rubenstein, both of Buffalo, N. Y., for Reliable Credit Clothing Co.; John W. Ryan and Merritt N. Baker, both of Buffalo, N. Y., for Buffalo Shirt Co.; Lyman M. Bass, of Buffalo, N. Y., for Hens & Kelly; Eugene Warner, of Buffalo, N. Y., for Antwerp Diamond Co.; Irving L. Fisk, of Buffalo, N. Y., for Sultzbach Clothing Co., Inc.; and Charles E. Hughes, of New York City, for National Ass'n of Clothiers and National Retail Dry Goods Dealers' Ass'n— as amici curiæ.

Stephen T. Lockwood, U. S. Atty., and Carl Sherman, Asst. U. S. Atty., both of Buffalo, N. Y., for appellee.

Before WARD, HOUGH, and MANTON, Circuit Judges.

MANTON, Circuit Judge. The grand jury for the Western district of New York returned an indictment against the appellant on the 9th day of March, 1920, charging the appellant, in 20 counts, with a violation of the act of Congress as amended on October 22, 1919, commonly referred to as the Lever Act. This bill in equity has been filed seeking to restrain the United States attorney for the Western district of New York from proceeding in the criminal action. A motion was made for an injunction restraining the United States attorney pending final hearing. The government opposed the application and contended for a dismissal of the bill. From a denial of plaintiff's motion for an interlocutory order, this appeal is taken.

[1] The right to maintain this action in equity to restrain the United States attorney in a criminal prosecution is challenged. The constitutionality of the act is involved. In addition thereto, the property rights and the reputation of the appellant are involved. The claim is that, if the act be held to be unconstitutional, the appellant will be deprived of its property without due or any process of law, will suffer repeated harassment, and may be subject to a multiplicity of prosecutions. It would suffer a great monetary loss, its reputation would be greatly impaired, and its good will and business, which it now owns possesses, and has enjoyed, will be greatly impaired, if not entirely destroyed, and thus irreparable damage will be done to it. We think that,

if the appellant is right in its contention that the act is unconstitutional, it may maintain this action in equity. This court said in Jacob Hoffman Brewing Co. v. McElligott et al., 259 Fed. 525, 170 C. C. A. 487:

"A suit in equity to enjoin the United States attorney from instituting criminal proceedings under a statute of the United States is manifestly a suit against the United States. * * * If property rights are invaded, and the statute in question is unconstitutional, it is void, is to be treated as nonexistent, and so no defense to the United States attorney. When instituting criminal proceedings under it, he is to be regarded, not as representing the United States in his official capacity, but as acting individually."

In Wilson, etc., v. New et al., 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, an action, similar in form, was commenced against the United States attorney for the Western district of Missouri. The district court held that the so-called Eight-Hour Railroad Law (Comp. St. §§ 8680a–8680d) was unconstitutional, but the Supreme Court reversed the decree on the ground that the law was constitutional, and dismissed the bill. In the later case of Hammer v. Dagenhart, 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918C, 724, in contesting the constitutionality of an act of Congress involving child labor, the same procedure was followed. The Supreme Court, in both cases, considered the merits of the claim of questioned constitutionality as to each act, and, while it did not in express words approve the procedure, it did necessarily approve it, by considering the merits of the issues raised.

The majority of the court are of the opinion that a direct injury to the property of the appellant here would follow if the law were declared unconstitutional, and that, if such were the case, it might maintain this action in equity. But we are of the opinion that the act of Congress does not contravene any of the constitutional provisions, and therefore this action cannot be successfully maintained. Act Aug. 10, 1917, c. 53, § 4, as amended by Act Oct. 22, 1919, § 2, reads as follows:

"That it is hereby made unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries. * * * Any person violating any of the provisions of this section upon conviction thereof shall be fined not exceeding $5,000 or be imprisoned for not more than two years, or both: Provided, that this section shall not apply to any farmer, gardener, horticulturist, vineyardist, planter, ranchman, dairyman, stockman, or other agriculturist, with respect to the farm products produced or raised upon land owned, leased, or cultivated by him: Provided further, that nothing in this act shall be construed to forbid or make unlawful collective bargaining by any co-operative association or other association of farmers, dairymen, gardeners, or other producers of farm products with respect to the farm products produced or raised by its members upon land owned, leased, or cultivated by them."

The amendment of October 22, 1919, included in the act, among the necessaries described, wearing apparel. Section 4 of the August 10, 1917, act provided no penalty, and an infraction or violation, we held, was no criminal offense. Mossew v. United States (C. C. A.) 266 Fed. 18, decided May 19, 1920. The amendment, however, provides a penalty, and after October 22, 1919, a violation of the act constitutes a criminal offense against the United States.

[2] The first section of the Act of October 22, 1919, refers to it as the Food Control Act. An emergency for legislation of this character, which makes the statute in question a war measure, has been held by the Supreme Court to still exist. Hamilton v. Kentucky Dis. Co., 251 U. S. 160, 40 Sup. Ct. 106, 64 L. Ed. ——. The passage of this act by Congress and the failure of the Senate to ratify the peace treaty with the German government, indicates that Congress treats the war as continuing and demobilization as incomplete. It must be said that this act, passed by Congress and approved by the President, indicated an intention to support the army and navy, as well as provide a remedy for the evils resulting from the war, so that there may be an equitable distribution of such necessaries as the country has, until the natural scarcity by lack of production and the extraordinary foreign demands, and other causes which depress normal competition, shall have subsided, at least during the period while we are still at war. The purpose of the act, given in section 1, is to assure an adequate supply and equitable distribution of wearing apparel. In Stewart v. Kahn, 11 Wall. 493, 20 L. Ed. 176, the Supreme Court said:

" * * * The power is not limited to victories in the field and the dispersion of the insurgent forces. It carries with it inherently the power to guard against the immediate renewal of the conflict, and to remedy the evils which have arisen from its rise and progress."

[3] Since we are still in a state of war, and the war time emergency has not expired, we are of the opinion that Congress could legislate, as it did, under the authority of its war powers, without contravening article 1, § 8, cl. 18, of the Constitution. During the recent war, the struggle between economic resources was all important. It did much to make for the morale of the army and navy. Food control, as a subject of war legislation, has been approved. Hamilton v. Kentucky Dis. Co., supra. Wearing apparel, declared to be one of the necessaries, is well within this sphere of legislation. To so legislate does not interfere with the police powers of the state. Food and wearing apparel control, during a war emergency, are properly the subject for war legislation, and by limiting charges for such necessaries Congress does not take property without due process of law. Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 79. The court, speaking through Chief Justice Waite, there said:

"In their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, etc., and in so doing to fix a maximum of charge to be made for services rendered, accommodations furnished, and articles sold."

Thus it will be observed that the Supreme Court pointed out that the state may fix prices on all commodities where the public has an interest. We think that, while a state of war exists, Congress may declare that the public interest in the price of food and wearing apparel warrants legislation declaring an unreasonable and unjust rate or charge in handling or dealing in the necessaries.

[4] But the appellant attacks the validity of the act, saying that it is too vague and indefinite to constitute a valid definition of crime.

The enactment is said to be in contravention of Amendments 5 and 6 of the Constitution. It is said to be in violation of Amendment 6, which provides that in all criminal prosecutions the accused shall enjoy the right to be informed of the nature and cause of the accusation, and of Amendment 5, in that it deprives dealers in wearing apparel of property and liberty without due process of law. The contention is advanced that the language of the statute:

"It is hereby made unlawful for any person willfully * * * to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries, to conspire [or] combine * * * with any other person, * * * to exact excessive prices for any necessaries"

—provides or establishes no particular standard of conduct; that ideas of reasonableness and excessiveness are so vague and varient that no dealer can tell whether his charges or prices are lawful, except by the subsequent opinion of the jury; and it is said that a process of law that would condemn one to lose property or liberty for an act, without having previously clearly denounced the act as a crime, would not seem to be due process, the argument being that the subsequent finding of a jury, therefore, expressing its opinion that the particular act constituting the sale as unlawful at the price charged, could not have been known to the defendant, and therefore knowing it only after conviction, would have all of the oppressiveness of an ex post facto law. The contention is that the words "unjust and unreasonable" make for the mischief. It is said that this claim is supported by the case of Tozer v. United States (C. C.) 52 Fed. 917 (opinion by Justice Brewer). Where the statute is within the legislative power of Congress, the courts are slow to say that they cannot understand and enforce its provisions. Before doing so, the courts exhaust their efforts at practical construction.

In Standard Oil Co. v. United States, 221 U. S. at page 69, 31 Sup. Ct. at page 517, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, the Supreme Court said:

"So far as the arguments proceed upon the conception that in view of the generality of the statute it is not susceptible of being enforced by the courts, because it cannot be carried out without a judicial exertion of legislative power, they are clearly unsound. The statute certainly generically enumerates the character of acts which it prohibits and the wrong which it was intended to prevent. The propositions, therefore, but insist that, consistently with the fundamental principles of due process of law, it never can be left to the judiciary to decide whether in a given case particular acts come within a generic statutory provision. But to reduce the propositions, however, to this their final meaning makes it clear that in substance they deny the existence of essential legislative authority and challenge the right of the judiciary to perform duties which that department of the government has exerted from the beginning. This is so clear as to require no elaboration. Yet let us demonstrate that which needs no demonstration, by a few obvious examples. Take, for instance, the familiar cases where the judiciary is called upon to determine whether a particular act or acts are within a given prohibition, depending upon wrongful intent. Take questions of fraud. Consider the power which must be exercised in every case, where the courts are called upon to determine whether particular acts are invalid, which are, abstractly speaking, in and of themselves valid, but which are asserted to be invalid because of their direct effect upon interstate commerce."

In Miller v, Strahl, 239 U. S. at page 434, 36 Sup. Ct. at page 149, 60 L. Ed. .364, the court said, speaking through Justice McKenna:

"Plaintiff in error contends, further, that the statute 'is lacking in due process of law,' because 'it fails to prescribe any fixed rule of conduct.' The argument is that the requirement 'to do all in one's power' fails to inform a man of ordinary intelligence what he must or must not do under given circumstances. Rules of conduct must necessarily be expressed in general terms, and depend for their application upon circumstances, and circumstances vary. It may be true, as counsel says, that 'men are differently constituted,' some being 'abject cowards, and few only are real heroes'; that the brains of some people work 'rapidly and normally in the face of danger, while other people lose all control over their actions.' It is manifest that rules could not be prescribed to meet these varying qualities. Yet all must be brought to judgment, and what better test could be devised than the doing of 'all in one's power' as determined by the circumstances? The case falls, therefore, under the rule of Nash v. United States, 229 U. S. 373, and not under the rule of International Harvester Co. v. Missouri, 234 U. S. 199."

In Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232, Justice Holmes said:

"And thereupon it is said that the crime thus defined by the statute contains in its definition an element of degree as to which estimates may differ, with the result that a man might find himself in prison because his honest judgment did not anticipate that of a jury of less competent men. The kindred proposition that 'the criminality of an act cannot depend upon whether a jury may think it reasonable or unreasonable; there must be some definiteness and certainty,' is cited from the late Mr. Justice Brewer, sitting in the Circuit Court. Tozer v. United States, 52 Fed. 917, 919. But apart from the common law as to restraint of trade, thus taken up by the statute, the law is full of instances where a man's fate depends on his estimating rightly, that is, as the jury subsequently estimates it, some matter of degree. If his judgment is wrong, not only may he incur a fine or a short imprisonment, as here; he may incur the penalty of death. * * * 'The criterion in such cases is to examine whether common social duty would, under the circumstances, have suggested a more circumspect conduct.' 1 East, P. C. 262. If a man should kill another by driving an automobile furiously into a crowd, he might be convicted of murder, however little he expected the result."

The so-called "rule of reason," as announced in Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, and United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, has changed the rule as laid down in the Tozer Case. Practically all common-law crimes were originally defined by the common opinion of people, which found expression in the judgment of juries and courts. In everyday practice in the civil courts, questions of fact are determined by what a jury considers a reasonable time for performance, or substantial performance. In tort cases, involving negligent conduct, the verdict of the jury lays down a standard of reasonable and ordinary care and diligence, and the conclusion of the jury answers the question of what the defendant should have done or refrained from doing, or what act of commission or omission is branded as unreasonable and careless in the exercise of due diligence. Thus large verdicts are awarded, and consequential payments made therefor daily in commercial life. Some of the criminal statutes are dependent upon how reasonable men would conduct themselves under similar circumstances. Questions of fraud

and deceit are answered by determining what reasonable conduct would have dictated to the person charged with the fraud and deceit. Undue and unreasonable restraints in trade are determined as questions of fact. "Unfair methods of competition" have been declared objectionable by Congress, and the statute has been declared constitutional. Sears Roebuck v. Federal Trade Comm., 258 Fed. 307, 169 C. C. A. 323, 6 A. L. R. 358. There it was said:

"If the expression 'unfair methods of competition' is too uncertain for use, then under the same condemnation would fall the innumerable statutes which predicate rights and prohibitions upon 'unsound mind,' 'undue influence,' 'unfaithfulness,' 'unfair use,' 'unfit for cultivation,' 'unreasonable rate,' 'unjust discrimination,' and the like."

In the criminal side of the court statutes are enforced daily which prohibit schemes to defraud, and there are no schedules of acts or specific definition of the forbidden conduct. There is left to the courts freedom to condemn any new or ingenious way that was unknown at the time the statutes were enacted. In determining what is an unjust and unreasonable rate, many elements may be submitted to the jury, the cost price to the merchant, his overhead charges, his rent, what is a customary and usual margin of profit as it exists in the trade, the length of time he carried the article, and his interest charges may also be of importance. The defendant can be generally guided by these elements, which should plainly lead him between the extreme of the obviously illegal and the plainly lawful.

[5, 6] It is contended that the statute in question is an arbitrary class legislation, and therefore in violation of the Constitution. Section 4 provides:

"Provided, that this section shall not apply to any farmer, gardener, horticulturist, vineyardist, planter, ranchman, dairyman, stockman, or other agriculturist, with respect to the farm products produced or raised upon land owned, leased, or cultivated by him."

It is argued that farmers, gardeners, ranchmen, dairymen, or stockmen, or other agriculturists, with respect to other farm products, may make unjust and unreasonable rates and charges with impunity, but that, if the miners of coal, manufacturers and dealers in farm machinery and equipment, refiners of sugar, or dealers in food products do so, they violate the act. Therefore there is a discrimination of class. The power of classification has had a very broad range. In Atchison, Topeka & Santa Fé R. R. Co. v. Matthews, 174 U. S. 96, 19 Sup. Ct. 609, 43 L. Ed. 909, the court said:

"The very idea of classification is that of inequality, so that it goes without saying that the fact of inequality in no manner determines the matter of constitutionality."

Whether it would have been better policy to have included the farmer or ranchman, or not to have made such a comprehensive classification as the statute does, is not within our province to decide. Whether the existing circumstances and the times call for such a rule of conduct as to exclude farmers from the purposes of the act was a matter for the Congress to decide. Congress could make this classi-

fication, and it be held not in contravention of the Constitution. International Harvester Co. v. Missouri, 234 U. S. 199, 34 Sup. Ct. 859, 58 L. Ed. 1276, 52 L. R. A. (N. S.) 525.

Some latitude must be allowed to legislative judgment in selecting the basis of community. It must be palpably arbitrary to authorize a judicial review of it, and it cannot be disturbed by the courts unless they can see clearly that there is no fair reason for the law that would not require with equal force its extension to others whom it leaves untouched. Mo., Kan. & Tex. R. v. May, 194 U. S. 267, 24 Sup. Ct. 638, 48 L. Ed. 971; Williams v. Arkansas, 217 U. S. 79, 30 Sup. Ct. 493, 54 L. Ed. 673, 18 Ann. Cas. 865. Here Congress has limited the exemption from the operation of the statute to farmers, gardeners, and agriculturists only with respect to products of the land produced upon land owned, leased, or cultivated by them. Congress may have had in mind the encouragement of the farmers to larger production. It was essential to have full production from land in the emergency.

In German Alliance Ins. Co. v. Supt. of Ins., 233 U. S. 389, 34 Sup. Ct. 612, 58 L. Ed. 1011, L. R. A. 1915C, 1189, the court said:

"A citation of cases is not necessary, nor for the general principle that a discrimination is valid, if not arbitrary, and arbitrary in the legislative sense, that is, outside of that wide discretion which a Legislature may exercise. A legislative classification may rest on narrow distinctions. Legislation is addressed to evils as they may appear, and even degrees of evil may determine its exercise."

We think Congress may well, as it did, legislate exempting the farmer exercising its war powers under the Constitution.

[7] While it is true that Congress conferred on the President by the statute the power to fix prices, as section 1 of the act provides:

"The President is authorized to make such regulations and to issue such orders as are essential effectively to carry out the provisions of this act."

The appellant complains that no orders were issued with reference to wearing apparel, but this was a power which the President could have exercised, had he thought the circumstances warranted it. He likewise need not make orders in reference to fixing prices as to wearing apparel. Such orders, if issued, would not add to the terms of an act of Congress and make conduct criminal which such laws leave untouched. United States v. United Verde Copper Co., 196 U. S. 207, 25 Sup. Ct. 222, 49 L. Ed. 449. He can neither abridge nor enlarge the criminal responsibilities under the statute. Indeed, it is obvious that he could not fix a maximum rate of charge on wearing apparel as a foundation for laying indictments. The statute fixes it in the terms of unjust and unreasonable rates and charges.

We find no error in denying the injunction below. The order is affirmed.

WARD, Circuit Judge (concurring). While I agree with the majority of the court that the Lever Act is constitutional as a war measure, I think the court below, sitting in equity, had no jurisdiction of a bill

to enjoin the United States attorney from instituting the prosecution under it.

The majority of the court hold that there is such a direct injury to the plaintiff's property rights as to justify the injunction, if the act be unconstitutional. But, as we have held the act to be constitutional, any inquiry as to injury is irrelevant and obiter. Conceding, for the purpose of argument only, that there was such an injury, the court could do nothing in the suit, because the other condition of jurisdiction that the act was unconstitutional, or, if constitutional that the United States attorney was exceeding his authority, does not exist. We so held in Hoffman v. McElligott (D. C.) 259 Fed. 525. Yet the interlocutory order denying the injunction is affirmed, and the cause left to go on to final hearing, although the court can never give any relief whatever. I think the bill should have been dismissed by the court below and by this court, as was done in the case of Dryfoos v. Edwards, 251 U. S. 146, 40 Sup. Ct. 106, 64 L. Ed. —— (opinion of the Supreme Court, December 15, 1919).

In the cases of Wilson v. New, 243 U. S. 332, 37 Sup. Ct. 298, 61 L. Ed. 755, L. R. A. 1917E, 938, Ann. Cas. 1918A, 1024, and Hammer v. Dagenhart, 247 U. S. 251, 38 Sup. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724, the bill alleged direct injury to the plaintiff's property and that the acts in question were unconstitutional. In each case the United States attorney moved to dismiss on the ground that the act was constitutional and the bill without equity. This motion admitted the allegations as to the injury to the plaintiff's property. The Supreme Court, finding the act constitutional in the Wilson Case, dismissed the bill. On the other hand, finding the act unconstitutional in the Hammer Case, and direct injury to plaintiff's property rights being admitted, it affirmed the final decree granting the injunction. In Ruppert v. Caffey, 251 U. S. 264, 40 Sup. Ct. 141, 64 L. Ed. ——, the bill contained allegations of direct and irreparable injury to plaintiff's property and the motion was for a preliminary injunction. The United States attorney moved to dismiss the bill for want of jurisdiction, and it was so dismissed.

If we had held the act to be unconstitutional, it would then have been necessary to determine whether there was such an injury to the plaintiff's property as justified jurisdiction in equity. On this point I think there was not. The defendant's reputation, credit, and good will, one or all, will be as much affected as if the indictment, instead of containing 20 counts, had contained but one. The United States attorney in his affidavit denies that he is making any charges against the defendant, except those contained in this particular indictment, or that he has threatened further indictments. The defendant is not prevented from selling its stock of wearing apparel at just and reasonable rates and charges, because it has been prosecuted for selling these particular garments at what is alleged to be an unjust and unreasonable rate or charge. If wrongfully convicted, it will have a perfectly adequate remedy by writ of error direct to the Supreme Court.

I think the bill should have been dismissed by the court below, and should now be dismissed in this court, for want of jurisdiction.

HOUGH, Circuit Judge (concurring). With the main argument and conclusion of Judge MANTON I agree, and what follows is but to emphasize some matters thought important. Whether "property rights are invaded" is a question of degree. Yet oftentimes the degree of invasion is a test of equitable jurisdiction. Thus there is usually no difference in material kind between a single act of nuisance and a continuing nuisance. So here; for one making a sale a month might perhaps continue to exist in a business sense under this statute; he could find out whether he was a criminal before he was ruined. But a retail storekeeper, who cannot do a day's business without running the risk of perhaps a thousand indictments, is suffering a very real invasion.

When the Lever Act was amended, this country was and still is in a state that may be described as "official war." This is substantially the finding of the Kentucky Distilleries Case, supra. It may be likened to the European "state of siege," and continues in Congress all the war powers of the United States. If we were in a state of "official" peace, this statute would in my judgment be unconstitutional, under International Harvester Co. v. Kentucky, 234 U. S. 216, 34 Sup. Ct. 853, 58 L. Ed. 1284. The condemnation there expressed (especially at page 223) is applicable here word for word. It would also be constitutionally obnoxious because it is a gross piece of class legislation; incapable of distinction from that condemned in Connolly v. Union, etc., Co., 184 U. S. 540, 22 Sup. Ct. 431, 46 L. Ed. 679. But the statute is begotten by war, and is constitutionally excused (i. e., justified) by the war power, which is superior to, and not to be measured by, the police powers of the several states.

Police powers generally are "nothing more or less than the powers of government inherent in every sovereignty to the extent of its dominion." The License Cases, 5 How. at page 583, 12 L. Ed. 256. A state can neither declare nor conduct a war; the United States can, and the greater the sovereign the greater the power. The United States can conduct a war in its own way, and the national sovereignty, dominion, or war power extends to every war necessity, of which the Congress is the sole judge. Congress decides that the necessity exists, and meets it in its own discretion, subject only to some procedural restrictions in favor of personal liberty, indicated, but not delimited, by Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281 and kindred decisions.

In regulating civil and commercial life in war time, the nation, through the Congress, is exercising the first law of nature, self-defense, whereof the limits are incapable of predetermination. But it is surely within those limits to fix prices by legislative fiat and punish every man varying therefrom; the present statute does not go that far, for practically it asks the usually soft-hearted jury to issue the fiat.