UNITED STATES *v.* ANDERSON.

1. Under the act of March 12th, 1863, commonly called the "Abandoned or Captured Property Act," it is not necessary that a party preferring his claim in the Court of Claims for the proceeds of property taken and sold under it, to prove, in addition to his own loyalty, the loyalty of the persons from whom he bought the property taken and sold; the property having been purchased by him in good faith, and without intent to defraud the government or any one else.

2 Notwithstanding the 4th section of the act of June 25th, 1868, the vendors of the property so taken and sold are competent witnesses, on a claim preferred by the owners in the Court of Claims, in supporting such claim, if they themselves never had any title, claim, or right against the government, and are not interested in the suit.

3. As respects rights intended to be secured by the above-mentioned Abandoned or Captured Property Act, "the suppression of the rebellion" is to be regarded as having taken place on the 20th of August, 1866, on which day the President by proclamation declared it suppressed in Texas "and throughout the whole of the United States of America," that same date being apparently adopted by Congress in a statute continuing a certain rate of pay to soldiers in the army "for three years after the close of the rebellion, as announced by the President of the United States, by proclamation bearing date August 20th, 1866."

4. Under the Captured or Abandoned Property Act, the Court of Claims may render judgment not only generally for the claimant, but for a specific sum as due to him.

APPEAL from the Court of Claims; the case being this:

Congress, by act of July 13th, 1861,* passed soon after the outbreak of the late rebellion, enacted that it might be

---

* 12 Stat. at Large, 257.

lawful for the President, by proclamation, to declare that the inhabitants of any State or part of a State where such insurrection was existing were in a state of such insurrection, and that thereupon (with a proviso that the President might, to a limited extent and under regulations to be prescribed by the Secretary of the Treasury, license it) all " commercial intercourse by and between the same and citizens thereof, and citizens of the rest of the United States, should cease, and be unlawful so long as such condition of hostility should continue." By a subsequent act of July, 17th, 1862,* it was enacted—

" That to insure the speedy termination of the present rebellion, it shall be the duty of the President of the United States to cause the seizure of all the estate and property, money, stocks, credits, and effects of the persons hereinafter named in this section, and to apply and use the same and the proceeds thereof for the support of the army of the United States."

The enumeration of persons includes several classes of persons; and the section concludes by declaring that

" All sales, transfers, or conveyances of any such property shall be null and void."

Another section goes on to say:

" And if any person within any State or Territory of the United States, other than those named as aforesaid, after the passage of this act, being engaged in armed rebellion against the government of the United States, or aiding or abetting such rebellion, shall not within sixty days after public warning and proclamation duly given and made by the President of the United States, cease to aid, countenance, and abet such rebellion, and return to his allegiance to the United States, all the estate and property, money, stocks, and credits of such persons shall be liable to seizure as aforesaid, and it shall be the duty of the President to seize and use them as aforesaid, or the proceeds thereof. *And all sales, transfers, or conveyances of any such prop-*

---

* 12 Stat. at Large, 590.

*erty, after the expiration of the said sixty days from the date of such warning and proclamation, shall be null and void."*

By a still later act, one passed when the armies of the United States were beginning to march into the rebellious regions—the act, namely, of March 12th, 1863*—entitled " An act to provide for the collection of abandoned property, &c., in insurrectionary districts within the United States," it was provided as follows :

" Any person claiming to have been the owner of any such abandoned or captured property may, *at any time within two years after the suppression of the rebellion,* prefer his claim to the proceeds thereof in the Court of Claims; and on proof to the satisfaction of said court (1) of his ownership of said property, (2) of his right to the proceeds thereof, and (3) that he has never given any aid or comfort to the present rebellion, receive the residue of such proceeds, after the deduction of any purchase-money which may have been paid, together with the expense of transportation and sale of said property, and any other lawful expenses attending the disposition thereof."*

The time mentioned in this act as that within which a party might prefer his claim, "any time," to wit, " within two years after the suppression of the rebellion," was one which, as events in the conclusion of the rebellion subsequently proved, was not, to common apprehension, entirely definite.   As matter of fact, rebellious districts were brought under the control of the government in different parts of the South at different times, and in April, 1865, the armies of the rebel generals Lee and Johnston surrendered; their surrender being followed by that of Taylor's army, on the 4th of May, and by that of Kirby Smith's, on the 26th of the same month.   With this last-named surrender, all armed resistance, in the least formidable, to the authority of the government ceased, and, as *matter of fact*, the rebellion was prostrate, though rebel cruisers continued their depredations on our commerce, and though there were, in Texas and else-

---

* 12 Stat. at Large, 820.

where, some wandering bands of robbers. Still, after Kirby Smith's surrender, May 26th, 1865, intercourse, commercial and other, between the inhabitants of the different sections, began to resume itself; trade opened, more or less, on its ancient basis, remittances were made, debts were paid or compromised, and bills of exchange were drawn between the inhabitants of the two sections.

The courts, which, in each section, had been closed to the inhabitants of the other, were soon opened, in form at least. The Court of Claims assumed jurisdiction of cases under the Abandoned Property Act, and between the termination of actual hostilities and the date fixed by the court below as the legal suppression of the rebellion (20th August, 1866), thirty causes were commenced in that court under the act, and jurisdiction of them entertained.

In this court, the causes pending at the beginning of the war to which inhabitants of the States in rebellion were parties, and which had been suspended and postponed from term to term during the continuance of the war, were, at the December Term, 1865, by the order of the court, called and heard in their order on the calendar, or on special days to which they were assigned.

Post-offices were reopened;* the letting of contracts for mail service throughout the rebellious States resumed;† and the revenue system extended throughout the same States.‡

The Federal courts, too, were reopened in the insurrectionary districts.

But notwithstanding all this, the late rebellious States were not politically restored to the Union, nor were many of them so restored till long afterwards. On the contrary, many of them were kept under military government, in virtue of statutes of the United States known as the reconstruction acts. And the complete *status ante bellum* was not yet visible.

So far as executive recognitions of the date when the rebellion was to be assumed to have been " suppressed " were

---

* Postmaster-General's Report, 1868, p. 263.        † Ib. 1865, pp 9, 10

‡ Report of the Secretary of the Treasury, 1865, pp. 29 30.

concerned, the government issued three proclamations, one dated June 13th, 1865,* in relation to the suppression of the rebellion in Tennessee; another, dated April 2d, 1866,† in regard to the suppression of the rebellion in the States of Georgia, *South Carolina*, Virginia, Tennessee, Alabama, Louisiana, Arkansas, Mississippi, and Florida; *and the third, dated August 20th*, 1866,‡ *declaring the rebellion suppressed in Texas,* " *and throughout the whole of the United States of America.*"

And an act of Congress, passed March 2d, 1867,§ declared that a previous act of Congress, passed June 20th, 1864,‖ to increase the pay of soldiers in the army, should be " continued in full force and effect for three years after *the close of the rebellion, as announced by the President of the United States, by proclamation bearing date August 20th*, 1866."

In this state of enactments, proclamation, and fact, one Anderson, a free man of color, possessed of real and personal property, by occupation a drayman and cotton sampler, and a resident of Charleston, South Carolina, preferred, on the *5th of June*, 1868, to the Court of Claims, under the provisions of the already-mentioned " Abandoned Property Act" of 1863, as it was familiarly styled, a claim for the residue of the proceeds of some cotton.

Twenty days after Anderson preferred his claim to the Court of Claims—that is to say, on the 25th June, 1868—Congress passed a law,¶

" That no plaintiff, or claimant, or any person, from or through whom any such plaintiff or claimant derives his alleged title, claim or right against the United States, or any person interested in any such title, claim, or right, shall be a competent witness in the Court of Claims in supporting any such title, claim, or right."

When the matter came on afterwards to be heard, Anderson proved this case (proving it, in part, by two persons, the one named Fleming, and the other Doucen, who resided within the insurrectionary district, and from whom he had

| * 13 Stat. at Large, 763. | † 14 Id. 811. | ‡ Ib. 814. |
| § Ib. 422, § 2. | ‖ 13 Id. 144. | ¶ 15 Id. § 4. |

bought the cotton), the case, to wit, that he had bought part of the cotton in the early part of the war, and the rest in the autumn of 1864, before the evacuation of Charleston by the rebels; that on the 5th March, 1865, the military authorities of the United States being now in possession of Charleston, he reported it to them, and that on the 5th of April following, it was removed, under their direction, from its place of deposit to the Charleston custom-house, whence it was shipped to New York, and there sold for the United States, and the gross proceeds paid into the treasury; the net proceeds amounting to $6723. The loyalty of Fleming and Doucen, from whom the cotton was purchased, was not proven, but that of Anderson was, and that he had never given any aid or comfort to the rebellion, or to the persons who were engaged in it.

In the Court of Claims, the counsel for the government urged four principal grounds of objection to the allowance of the claim.

1st. That the action was barred by the limitation in the statute of March 12th, 1863.

2d. That if in this they were mistaken, still that the suit must fail, because the persons who sold the property to Anderson, being residents of an insurrectionary district, were unable, under the state of the law on this subject, to convey title to him.

3d. That the vendors of the cotton in question were incompetent witnesses, by reason of the act of 25th June, 1865, and that their testimony should have been excluded.

4th. That the court had no authority to render judgment for a specific sum, its power being limited to the point of deciding whether the claimant was entitled to recover at all, leaving the amount to be determined by computation by the proper officers of the Treasury Department.

But the Court of Claims held:

1st. That the claim was not barred by the limitation mentioned

2d. That the cotton had not been *ipso facto* forfeited because it had belonged to persons resident in the insurrec-

tionary district, no proceedings having been instituted to confiscate the same as the property of such persons.

3d. That the vendors of the property were not incompetent witnesses.

4th. That upon the whole case the claimant was entitled to judgment for the net proceeds as proved.

The correctness of these several rulings was the matter now here for review.

*Mr. Hoar, Attorney-General, and Mr. R. S. Hale, special counsel, for the United States:*

1. Was Anderson's claim, which was preferred on the 5th of June, 1868, preferred at any time within two years after the suppression of the rebellion?

The question when a suppression of the rebellion was made is a question of the actual termination of the war, and one distinct from the political question of the continuance of the rights of war, after the termination in fact of hostilities. The true test of the existence of civil war was tersely stated by Grier, J., speaking for the court in the *Prize Cases.** "When the regular course of justice is interrupted by revolt, rebellion, or insurrection, so that the courts of justice cannot be kept open, *civil war exists,*" &c. The test of its termination is logically the same. When the armed organization against the government has ceased to exist, when the courts of justice are no longer prevented by violence, there is no longer civil war, and the rebellion is suppressed. Now, after the surrender of Kirby Smith, armed resistance to the authority of the United States ceased, the civil war was ended, and the rebellion suppressed, as *matter of fact.* In the universal speech of the people, "the war was over." This is an historical fact, of which this court will take judicial cognizance. Their own proceedings and the call of their docket show it. But the fact is part of public history, and universally known. From that date, all claimants were entitled to sue in the Court of Claims, under the act of 12th

---

* 2 Black, 667.

March, 1863, and at the expiration of two years from that date (26th May, 1867), their right to sue terminated. The claim was therefore too late.

The various proclamations of the President did not create the condition of peace, but were executive recognitions of the fact that peace was restored, just as the actions of the courts were judicial recognitions of the same fact.

But if executive action is requisite to establish the fact of the suppression of the rebellion, then the proclamation of April 2d, 1866, does it as respects South Carolina; and the cause of action having arisen in that State the statute began to run whenever the rebellion was suppressed *there.* If this is so, the claim is still too late.

As to the act of Congress of March 2d, 1867, its object was not to determine the end of the rebellion, either for judicial or legislative purposes, but to fix a definite time when the additional pay given to soldiers by the act of 20th June, 1864, should terminate. And it does not, in terms, fix the end of the rebellion; but fixes the desired day by recital from " the close of the rebellion, *as announced by the President*," &c. To give to it the effect of fixing the close of the rebellion for the purposes of the Abandoned and Captured Property Act, or for any other judicial or legislative purpose, would be to give it an effect not contemplated by Congress.

2. The loyalty of Fleming and Doucen, who sold the cotton to Anderson, is not proven. They resided in South Carolina, and such residence fixes on them, in the absence of proof of loyalty, rebel character. Sales by them, under the act of July 17th, 1862, are " null and void." Nor is the act of 1862 repealed by the Abandoned and Captured Property Act. These acts are to a limited extent *in pari materia,* and are so far to be construed by the aid of each other. But in their principal scope they relate to different subjects, provide for different ends, and contain no provisions inconsistent with each other, so that both cannot stand. The proof of ownership required under the latter act is of necessity lawful ownership, as well under the act of 1862 as under all other subsisting laws.

But this is no longer an open question in this court since the case of *McKee* v. *United States.** The language of the court is:

" This statute prohibited a person occupying the position A. W. McKee did from selling his property; and it follows, as he had no capacity to dispose of it, that the claimant could acquire no title to it."

[The remaining two points taken below, though still insisted on, were less pressed by the learned counsel here.]

*Messrs. J. A. Wills, G. Taylor, T. J. D. Fuller, A. G. Riddle, and W. P. Clarke, contra,* for the claimant in this case, or for claimants in other cases involving the same general questions, and argued with this one and disposed of by the opinion in it.

Mr. Justice DAVIS delivered the opinion of the court.

Whether the positions taken by the learned counsel of the United States in the court below, and maintained in this court also, are well taken or not depends on the construction to be given the act concerning abandoned and captured property, and the 4th section of the act of June 25th, 1868.

The act of March 12th, 1863, in one particular, inaugurated a policy different from that which induced the passage of other measures rendered necessary by the obstinacy and magnitude of the resistance to the supremacy of the National authority. To overcome this resistance, and to carry on the war successfully, the entire people of the States in rebellion were considered as public enemies; but it is familiar history that there were many persons whom necessity required should be treated as enemies who were friends, and adhered with fidelity to the National cause. This class of people, compelled to live among those who were combined to overthrow the Federal authority, and liable at all times to be stripped of their property by the usurped government, were

---

* 8 Wallace, 163.

objects of sympathy to the loyal people of this country, and their unfortunate condition was appreciated by Congress.

During the progress of the war it was expected that our forces in the field would capture property, and, as the enemy retreated, that property would remain in the country without apparent ownership, which should·be collected and disposed of. In this condition of things Congress acted. While providing for the disposition of this captured and abandoned property, Congress recognized the status of the loyal Southern people, and distinguished between property owned by them, and the property of the disloyal. It was not required to do this, for all the property obtained in this manner could, by proper proceedings, have been appropriated to the necessities of the war. But Congress did not think proper to do this. In a spirit of liberality it constituted the government a trustee for so much of this property as belonged to the faithful Southern people, and while directing that all of it should be sold and its proceeds paid into the treasury, gave to this class of persons an opportunity, at any time within two years after the suppression of the rebellion, to bring their suit in the Court of Claims, and establish their right to the proceeds of that portion of it which they owned, requiring from them nothing but proof of loyalty and ownership.

It is true the liberality of Congress in this regard was not confined to Southern owners, for the law is general in its terms, and protects all loyal owners; but the number of Northern citizens who could, in any state of the case, be *bonâ fide* owners of this kind of property was necessarily few, and their condition, although recognized in the law, did not induce Congress to incorporate in it the provision we are considering.

The measure, in itself of great beneficence, was practically important only in its application to the loyal Southern people, and sympathy for their situation doubtless prompted Congress to pass it. It is in view of this state of things, as it is the duty of a court in construing a law to consider the circumstances under which it was passed and the object to

be accomplished by it, that we are called upon to apply this particular provision to the facts of this case. The loyalty of the claimant is not questioned, but his ownership, in the sense of the law, of the property in dispute is denied.

It is not denied that he purchased the property in good faith for value, and with no purpose to defraud the government or any one else; but it is said the persons from whom he bought resided in South Carolina, were presumed to be rebels, and were, therefore, prohibited from selling.

This is an attempt to import from the confiscation law of July 17th, 1862, into this law, a disability which it does not contain. If this could be done, but very little benefit would accrue to the loyal people of the South from the privilege conferred on them by the law in question. It is well known that nearly all the Southern people were engaged in the rebellion, and that those who were not thus employed furnished the exception rather than the rule. Few as they were, the necessities of life required that they should buy and sell, and, equally so, that their trading should be free and unrestricted.

This condition of things Congress was aware of, and if it had been its purpose to limit the privilege in controversy to the loyal citizen, who happened to acquire his property from another person equally loyal, they would have said so. But Congress had no such narrow policy in view. Its policy in the matter was broad and comprehensive, and embraced within its range all persons who had adhered to the Union. It treated all alike, and did not discriminate in favor of the person who could trace his title through a loyal source, and against him who was not so fortunate. It did not consider the loyal planter, who raised his own cotton and rice, as entitled to any more protection than the dweller in the cities and towns who lived by traffic, and bought where he could buy the cheapest.

The confiscation law, however, was not intended to apply to a person occupying the status of this claimant. The purpose which Congress had in view in passing that law was very different from that which induced it, in the Captured

and Abandoned Property Act, to extend a privilege to the loyal owner. The confiscation law concerns rebels and their property; was intended as a measure to cripple their resources; and, in so far as it claims the right to seize and condemn their property, as a punishment for their crimes, recognizes that certain legal proceedings are necessary to do so. But by the act in question the government yielded its right to seize and condemn the property which it took in the enemy's country if it belonged to a faithful citizen, and substantially said to him, " We are obliged to take the property of friend and foe alike, which we will sell and deposit the proceeds of in the treasury; and if, at any time within two years after the suppression of the rebellion, you prove satisfactorily that of the property thus taken you owned a part, we will pay you the net amount received from its sale."

The two acts cannot be construed *in pari materiâ*. The one is penal, the other remedial; the one claims a right, the other concedes a privilege.

It is said the vendors of the cotton were incompetent witnesses by reason of the 4th section of the act of June 25th, 1868, which declares that no plaintiff or claimant, or any person from or through whom any such plaintiff or claimant derives his alleged title, claim, or right against the United States, or any person interested in any such title, claim, or right, shall be a competent witness in the Court of Claims in supporting any such title, claim, or right.

There are three classes of persons who are, by this section, prohibited from testifying. The claimant cannot testify, nor can the person who, after a claim has accrued to him against the United States, has sold or transferred it to the claimant, nor can any one who is interested in the event of the suit. Doucen and Fleming, the immediate vendors of Anderson, are not excluded by this rule. They were not interested in the suit, and in no sense did Anderson derive his claim against the United States through them. They never had any claim against the United States, because when the property was taken it belonged to Anderson, and it is

only after the property was sold that Anderson's claim even to the proceeds attached. If the property *in transitu* from Charleston to New York had been lost, no claim could arise under the law in favor of Anderson against the United States, his claim being contingent upon the proceeds of the property finally reaching the treasury.

But the point most pressed in the argument against the right to recover in this case relates to the limitation in the law. It is contended that the claim was barred by this limitation, as it was not preferred until the 5th of June, 1868. It is, therefore, necessary to determine when the time for preferring claims commenced, and when it ended. The words of the statute on this subject are, that any person claiming to be the owner of abandoned or captured property may, at any time within two years after the suppression of the rebellion, prefer his claim to the proceeds thereof in the Court of Claims. There is certainly nothing in the words of this provision which disables a person from preferring his claim immediately after the proceeds of his property have reached the treasury, and there is no good reason why a different interpretation should be given them. On the contrary, there is sufficient reason in the nature of the legislation on this subject, apart from the letter of the law, to bring the mind to the conclusion that Congress intended to give the claimant an immediate right of action. The same motive that prompted Congress to grant the privilege to prefer a claim at all, operated to allow it to be done so soon as the property had been converted into money. If in the condition of the country, it was known that the Union men of the South, as a general thing, would be unable to prosecute their claims while the war lasted, still it was recognized that some persons might be fortunate enough to do so, and to meet the requirements of their cases the right to sue at once was conferred. In the progress of the war, as our armies advanced and were able to afford protection to the Union people, it was expected that many of them, availing themselves of the opportunity, would escape into the National

lines, and be thus in a condition to secure the rights conceded to them by this statute; and the history of the times informs us that this expectation was realized.    To impute to Congress a design to compel these people, impoverished as they were known to be, to wait until the war was over before they could institute proceedings in the Court of Claims, would be inconsistent with the general spirit of the statute, and cannot be entertained.    If, then, the right to prefer a claim attached as soon as the money reached the treasury, when did it expire?    The law says two years after the rebellion was suppressed; but the question recurs, when is the rebellion to be considered suppressed, as regards the rights intended to be secured by this statute?    It is very clear that the limitation applied to the entire suppression of the rebellion, and that no one was intended to be affected by its suppression in any particular locality.    It might be suppressed in one State and not in another, but the citizen of the State that had ceased hostilities was in no better or worse position in this regard than the citizen of the State where hostilities were active.    The limitation was not partial in its character, but operated on all persons alike who are affected by it; was dependent on the solution of a great problem, and an interpretation of it which would prescribe one rule for the people of one State, and a different rule for those living in another State, cannot be allowed to prevail.

The point, therefore, for determination is, when, in the sense of this law, was the rebellion entirely suppressed.    And in this connection it is proper to say, that the purposes of this suit do not require us to discuss the question—which may have an important bearing on other cases—whether the rebellion can be considered as suppressed for one purpose and not for another, nor any of the kindred questions arising out of it, and we therefore express no opinion on the subject.

The inquiry with which we have to deal concerns its suppression only in its relation to those persons who are within the protection of this law.    It is argued, as the rebellion was in point of fact suppressed when the last Confederate general

surrendered to the National authority, that the limitation began to run from that date.   If this were so, there is an end to the controversy; but did Congress mean, when it passed the statute in question, that the Union men of the South, whose interests are especially cared for by it, should, without any action by Congress or the Executive on the sub-ject, take notice of the day that armed hostilities ceased be-tween the contending parties, and if they did not present their claims within two years of that time, be forever, barred of their recovery ?   The inherent difficulty of determining such a matter, renders it certain that Congress did not in-tend to impose on this class of persons the necessity of de-ciding it for themselves.   In a foreign war, a treaty of peace would be the evidence of the time when it closed, but in a domestic war, like the late one, some public proclamation or legislation would seem to be required to inform those whose private rights were affected by it, of the time when it terminated, and we are of the opinion that Congress did not intend that the limitation in this act should begin to run until this was done.   There are various acts of Congress and proclamations of the President bearing on the subject, but in the view we take of this case, it is only necessary to notice the proclamation of the President, of August 20th, 1866, and the act of Congress of the 2d of March, 1867.

On the 20th day of August, 1866, the President of the United States, after reciting certain proclamations and acts of Congress concerning the rebellion, and his proclamation of 2d of April, 1866, that armed resistance had ceased every-where except in the State of Texas, did proclaim that it had ceased there also, and that the whole insurrection was at an end, and that peace, order, and tranquillity existed through-out the whole of the United States of America.   This is the first official declaration that we have, on the part of the Ex-ecutive, that the rebellion was wholly suppressed, and we have shown, in a previous part of this opinion, that the limi-tation, in its effects on the persons whose rights we are con-sidering, did not begin to run until the rebellion was sup-pressed throughout the whole country.   But we are not

without the action of the legislative department of the government on this subject.  On the 20th day of June, 1864, Congress fixed the pay of non-commissioned officers and privates, and declared that it should continue during the rebellion; and on the 2d day of March 1867, it continued this act in force for three years from and after the close of the rebellion, as announced by the proclamation of the President.

Congress, then, having adopted the 20th day of August, 1866, in conformity with the announcement of the President, as the day the rebellion closed, for the purpose of regulating the pay of non-commissioned officers and privates, can it be supposed that it intended to lay down a harsher rule for the guidance of the claimants under the Captured and Abandoned Property Act, than it thought proper to apply to another class of persons whose interests it equally desired to protect.  In order to reach this conclusion, it is necessary to ascribe to Congress a policy regarding the statute under which this claim is preferred foreign to the views we have expressed concerning it.  Besides, it would require us to construe two acts differently, although relating to the same general subject, in the absence of any evidence that such was the intention of the legislature.  If we are right as to the motive which prompted Congress to pass the law in question, and the object to be accomplished by it, it is clear the point of time should be construed most favorably to the person who adhered to the National Union, and who has proved the government took his property, and has the money arising from its sale in the treasury.

As Congress, in its legislation for the army, has determined that the rebellion closed on the 20th day of August, 1866, there is no reason why its declaration on this subject should not be received as settling the question wherever private rights are affected by it.  That day will, therefore, be accepted as the day when the rebellion was suppressed, as respects the rights intended to be secured by the Captured and Abandoned Property Act.

The point taken that the court below was not authorized

to render judgment for a specific sum, but only to determine whether the claimant was entitled to receive the proceeds of his property, leaving it for an officer of the treasury to fix the amount, cannot be sustained.    To sustain this position, would require us to hold that for this class of cases Congress intended to constitute the Court of Claims a mere commission.    This court will not attribute to Congress a purpose that would lead to such a result, in the absence of an express declaration to that effect.

It is proper to say, in conclusion, that the case of *McKee* v. *United States,** cited as an authority against the claimant's right to recover, has no application whatever to this case.

JUDGMENT AFFIRMED.