# Richmond.

## RICHMOND FAIRFIELD RAILWAY COMPANY v. LINDA L. LLEWELLYN.

March 19, 1931.

Present, Prentis, C. J., and Holt, Epes, Hudgins and Browning, JJ.

The opinion states the case.

*Williams & Mullen, Guy B. Hazelgrove, G. D. Gibson* and *Ralph T. Catterall,* for the appellant.

*Albert O. Boschen, George E. Haw* and *William C. Miller, Jr.,* for the appellee.

BROWNING, J., delivered the opinion of the court.

The incipient step in the case before us was a bill of injunction sued out in the Circuit Court of Henrico county, Virginia, by the appellant, to enjoin and restrain the appellee, her agents, employees, etc., from obstructing a sewer or the easement therefor or the right of way thereof, or from molesting or interfering with or threatening appellant, its officers, agents, employees, etc., in going upon said right of way for the purpose of repairing, maintaining or operating the sewer upon the same or in any way molesting or violating appellant's right to the use and enjoyment of said sewer.

The parties hereto will hereafter be referred to as complainant and defendant, the relation borne by them in the trial court.

The bill was filed on August 5, 1926. An answer, prepared by herself, was then filed by the defendant, which was afterward, by leave of court, withdrawn temporarily, for the purpose of the interposition of her demurrer to the bill, and thereafter through counsel she filed an additional answer and cross-bill, to which the complainant filed a plea of the statute of limitations and its answer. A temporary injunction was awarded by the court in accordance with the prayer of the original bill and the depositions of the witnesses were taken by both parties to the litigation. The several steps in the pleadings and the evidence show the facts to be as follows:

During the progress of the World War the United States of America acquired lands at or near Seven Pines, Virginia, and constructed and operated thereon an ordinance depot and

munitions plant and in connection therewith established a village called Fairfield for the purpose of housing its employees. After the cessation of the war this village was named Sandston and at the time of the beginning of this controversy it had assumed town proportions with the incidental advantages of a larger community life.

Back in 1918 or 1919 the question of sewage and its disposal for the village of Fairfield became acute. Its inhabitants were then government employees. To effect this needful purpose the United States undertook to negotiate with the defendant and her husband for the right to construct and operate a sewage system or line across defendant's lands. The defendant and her husband owned a tract of 103.6 acres of land adjacent to said village. The effort to acquire this right by treaty or agreement failed and in July, 1919, the United States instituted proceedings for such acquisition by requisition, a summary and quick method, for such purpose, under the provisions of an act of Congress (40 Stat. 550, ch. 74, approved May 16, 1918, and amendments thereto). This act was a part of the emergency war legislation and in substance it clothed the President, during the continuance of the war, with authority to requisition land, or any interest therein, for the purpose of providing housing and community utilities for workers in industries connected with and essential to the national defense. Upon requisition the land might be at once taken and occupied. The President was also authorized to sell and convey such lands or interest therein, improvements, general community utilities, and parts thereof upon such terms and conditions as he might determine, and this he might do either before or after the termination of the war. The act empowered the President to effect its purposes through such agency or agencies as he might create or designate, and that he might authorize the creation of a corporation or corporations with a capital stock not to exceed $60,000,000.00 for such purposes. The United States Housing Corporation was

the creature of this authorization. The above amount was appropriated which was subsequently increased by statute to $100,000,000.00, and the excess was likewise appropriated. Appropriate provisions of the act likewise directed the President to make just compensation to the person or persons entitled to receive it for the lands or any interest therein so requisitioned and if the amount determined by him should be unsatisfactory to the person entitled thereto then seventy-five per centum of the amount should be paid to him and he was accorded the right to sue the United States to recover such further sum as, added to seventy-five per centum, would make up such amount as would be just compensation therefor. This suit, in accordance with the terms of sections 24 and 145 of the Judicial Code (28 U. S. C. A., sections 41, 250), could be brought in the United States District Court or the United States Court of Claims, subject to the applicable statute of limitations and the requirement of trial by the court without a jury.

Under an executive order of June 18, 1918, the President directed the Secretary of Labor to exercise all power and authority vested in him by virtue of the said housing act and an amendment of July 19, 1919, of the act (41 Stat. 224, ch. 24) recognized such appointment.

Section 5 of the act provided that all deeds or other instruments of conveyance executed by the United States Housing Corporation, where the legal title to the property in question was in the name of said corporation, and by the United States of America by the Secretary of Labor where such title was in the United States of America, should be conclusive evidence of the transfer of title to the property in question in accordance with their purport.

There were executed and perfected two instruments of requisition; the second was a duplicate of the first, except that it defined the width of the easement or right of way for the sewer, which was twenty-four feet.

The date of the first requisition was July 12, 1919, and of the second September 10, 1919.

Under this proceeding the United States at once took possession and occupation of the said easement or right of way for said sewer.

The things necessary to be done to make the acquisition of the easement valid from the complainant's viewpoint, were enumerated with much detail in the instrument of requisition and they need not be mentioned here because the fact that its terms were complied with is not denied. Legal compliance with the mechanics of the method of acquisition is not an issue, for it is conceded. The effect of it all as bearing on the validity of the title of the complainant to the easement is seriously questioned by the defendant for reasons hereafter to be considered and determined. The United States then constructed a ditch on the easement or right of way from six to ten feet wide and from one to three feet in depth through the lands of the defendant for a distance variously estimated by witnesses at from seven to fourteen hundred feet. A large type of piping was placed in this ditch, at first, but that was taken out and replaced with 15-inch sewer pipes which were called for by the plat filed with the requisition papers. The houses of the village of Fairfield occupied by the employees of the government were connected with this sewer. The ditch was never covered over, according to the testimony of the witness for the complainant, J. A. Baird, although the defendant testified that after August, 1926, the date of the filing of the bill of injunction, the sewer was closed. The discrepancy is probably accounted for by the possibility that defendant confused the ditch with the sewer piping. The sewage was discharged upon the right of way at the point on the lands of the defendant where the ditch and piping ended, the topography of the land at this point disclosing a depression or as some of the witnesses described it swamp or marsh land.

In the year 1920 the complainant and the United States of

America, through its agencies referred to, began contractual negotiations which culminated in the purchase of the easement or right of way by the complainant and the conveyance of it by the deed of January 20, 1921. The grantors were the United States Housing Corporation and the United States of America by the Secretary of Labor, and the grantee was the Richmond-Fairfield Railway Company, the complainant here.

The complainant acquired, by the same deed, title to the village of Fairfield, as owned by the grantors, which by and by grew and became the ambitious town of Sandston, adding, among other conveniences, to its corporate existence a public school. The said easement or right of way furnished the sewage facilities for the town as it had for Fairfield and the government employees, who were its occupants.

Theretofore the United States Housing Corporation for the purpose of settling with the defendant and compensating her under the provisions of the law for the property taken, offered the defendant the sum of $50.00 in full settlement. This was declined and later the War Department Claims Board, Appraisal Section, offered her the sum of $3,041.66, which amount was fixed by a committee of the Richmond Real Estate Exchange, which was likewise declined. This offer was finally withdrawn by the said Board for the reason that it had been advised by the United States Housing Corporation that the Secretary of Labor had already made an award and therefore it was without jurisdiction in the premises.

The requisition officer certified that at the time of the completion of the requisition of the easement or right of way he notified the defendant in accordance with the terms of the instrument of requisition of such action and of her rights as to obtaining just compensation. The defendant ignored this and testified that they (her husband and herself) never filed any claim with the "War Department" for compensation.

The defendant failed to avail herself of her right under

the provisions of the said housing act (40 Stat. 551, sec. 2) to accept seventy-five per centum of the award made and sue the United States for such further sum as would constitute just compensation, such suit to be prosecuted either in the United States District Court or the United States Court of Claims. Thus the matter dragged along until the complainant found the sewer pipes obstructed by the insertion in them of old tin buckets, bottles, cans, rags, etc. In order to remove the obstruction it was necessary for the complainant's employees to go upon the right of way and break open the pipes and restore them. The defendant forbade this and ordered complainant's employees off the premises, threatening them with various means of unpleasant summary expulsion. This occasioned the injunction bill and the ensuing litigation which involves questions of law extremely interesting, and more so, because the briefs are highly illuminating for their cogent reasoning, profound thought and clarity of expression.

The evidence is convincing that the sewage at the place of its discharge spreads over the right of way and outside of its lines on the lands of the defendant, saturating the ground with fecal matter which is offensive and unsanitary in the extreme. A gruesome story is told of conditions which reveal an intolerable situation. For miles away the air at times is permeated with foul odors, It would serve no needful purpose to detail the evidence upon which this statement is based and therefore we shall not do so.

The decree of the trial court of November 11, 1929, held that the United States Government did not, by its requisition, acquire title to the easement or right of way through the lands of the defendant and that the deed of the United States did not vest title in the complainant to the easement or right of way and that the plea of the statute of limitations interposed to the defendant's cross-bill did not lie, and vacated the injunction as originally granted and enlarged, and perpetually

enjoined and restrained the complainant from maintaining and operating the sewer through the lands of the defendant.

The decree is complained of and it is before us on an appeal allowed the complainant by this court.

The complainant submits two general assignments of error as follows:

(1) "The court erred in failing to hold that the complainant has title to the easement in question, and in holding that the respondent has complete title to the land.

(2) "The court erred in overruling the complainant's plea of the statute of limitations and in issuing an injunction according to the prayer of the cross-bill, thus holding that the five-year statute of limitations had not run on in the cause of action for flowage outside the easement."

Under the first assignment of error the complainant contends that the housing act was in force at the time of the requisition; that the requisition was constitutional; that the United States thereby acquired a fee simple title to the easement over the right of way for the purpose of a sewer and that the complainant, itself, acquired such title by virtue of its deed from the United States and that by reason of the six-year period of the statute of limitations had not run against the defendant was barred from successfully questioning the validity of the title and from the right to institute and prosecute a suit for compensation.

Under the second assignment of error the action of the trial court is brought in question in its holding that the five-year period of the statute of limitations had not run against a cause of action for damages for flowage outside the easement.

In contradistinction, the contentions of the defendant are that the act was unconstitutional, as were its methods of taking, and that it was not in force at the time of its alleged effectuation and that the acquisition of a fee in the easement was not within the war power of Congress and that the five-

year period of the Virginia statute of limitations had not run against a cause of action for damages to her lands for flowage outside the easement.

The following quotations from the housing act are urged as furnishing the basis for the contentions of the defendant:

"Be it enacted * * *, that the President, for the purposes of providing housing * * * and other general community utilities for such industrial workers as are engaged * * * in industries connected with and *essential to the nation's defense* * * *, *only during the continuation of the existing war,* is hereby authorized * * *.

"(a) To purchase, * * * requisition * * * such houses * * * and other general community utilities * * * as he may determine to be *necessary for the proper conduct of the existing war."* (Italics added.)

This statute was enacted May 16, 1918 (40 Stat. 550).

Now, says the defendant, the only constitutional justification for the application of the provisions of such a measure is the actual existence of war emergency when the national life is in jeopardy and, that, at the very time such provisions are sought to be enforced against the individual. The precise words of the defendant's counsel are: "The justiciable question always is whether or not a statute sought to be applied in a particular case against a person complaining or defending, does or does not violate the constitutional rights of that person at the time its terms and provisions are attempted to be enforced."

It is urged that at the time of the requisition in question the Armistice between the Allies and the Central Powers had been signed; that the Kaiser had abdicated his imperial throne; that the kings of Bavaria and Saxony had done likewise; that the American military forces, with few exceptions, had returned home and been demobilized and that the President had announced in sundry addresses before Congress that the war had ended when the terms of the Armistice had been accepted.

Therefore, it is argued, when the easement was taken the requisites of the statute did not exist, there was no *continuation of the existing war,* it was not *essential to the national defense,* because of the alleged fact that no war existed at the time.

Thus we are called upon to so hold, but to do so would be to ignore the rulings of the Supreme Court of the United States which has determined the exact issues presented. This, of course, we cannot do.

The case of *Hamilton* v. *Kentucky Distilleries & W. Co.* (1919), 251 U. S. 146, 40 S. Ct. 106, 109, 64 L. Ed. 194, is illuminating, for it is decisive of all the issues here presented except that of the statute of limitations.

It called in question the validity of the war time prohibition act. It was passed by Congress on November 21, 1918 (40 Stat. 1046), and approved by the President and provided as follows:

"That after June 30, 1919, until the conclusion of the present war and thereafter until the determination of demolization, the date of which shall be determined and proclaimed by the President of the United States, for the purpose of conserving the man power of the nation, and to increase efficiency in the production of arms, munitions, ships, food and clothing for the Army and Navy, it shall be unlawful to sell for beverage purposes any distilled spirits, and during said time no distilled spirits held in bond shall be removed therefrom for beverage purposes except for export."

The distilleries company brought suit in the United States District Court for the western district of Kentucky against Hamilton, collector of internal revenue, alleging that the act was void or had become inoperative, and prayed that he be enjoined from interfering with the withdrawal and sale of its whiskey in bond. The decision of the District Court was in favor of the plaintiff. The case went to the Supreme Court

of the United States and the court said, through Justice Brandeis:

"The contention is that between the date of its enactment (the act) and the commencement of these suits it had become evident that hostilities would not be resumed; that demobilization had been effected; that thereby the war emergency was removed, and that when the emergency ceased the statute became void.

"To establish that the emergency had passed, statements and acts of the President and of other executive officers are adduced; some of them antedating the enactment of the statute here in question. There are statements of the President to the effect that the war has ended and peace has come; that certain war agencies and activities should be discontinued; that our enemies are impotent to renew hostilities, and that the object of the act here in question has been satisfied in the demobilization of the Army and Navy. It is shown that many wartime activities have been suspended; that vast quantities of war materials have been disposed of; that trade with Germany has been resumed, and that the censorship of postal, telegraphic and wire communications has been removed."

This is very like the argument of the defendant in the case at bar which is plausible and forceful but the court continuing said:

"Assuming that the implied power to enact such a prohibition must depend not upon the existence of a technical state of war, terminable only with the ratification of a treaty of peace or a proclamation of peace (*United States* v. *Anderson,* 9 Wall. 56, 70, 19 L. Ed. 615, 619; *The Protector,* 12 Wall. 700, 702, 20 L. Ed. 463, 464; *J. Ribas y Hijo* v. *United States,* 194 U. S. 315, 323, 24 S. Ct. 727, 48 L. Ed. 994, 996), but upon some actual emergency or necessity arising out of the war or incident to it, still, as was said in *Stewart* v. *Kahn* (*Stewart* v. *Bloom*), 11 Wall. 493, 507, 20 L. Ed. 176, 179: 'The power is not limited to victories in the field and the dis-

persion of the insurgent forces. It carries with it inherently the power to guard against the immediate renewal of the conflict and to remedy the evils which have arisen from its rise and progress.' "

Section 5 of the housing act is, in part, as follows:

"That the power and authority granted herein shall cease with the *termination of the present war as formally proclaimed by the President,* except the power and authority to care for, rent, operate, and sell such property as remains undisposed of." (Italics added.)

This was an amendment of the original act of July 19, 1919 (41 Stat. 224, ch. 24). Thus the statute as of July 19, 1919, refers to the war as the "present war."

In the war time prohibition act construed in the case of *Hamilton* v. *Kentucky Distilleries & W. Co., supra,* the term employed was "conclusion of the war," and the court in that case had this to say: "* * * it is argued that the term 'conclusion of the war' should not be given its ordinary legal meaning; that instead it should be construed as the time when actual hostilities ceased; or when the Treaty of Peace was signed at Versailles, on June 28, 1919, by the American and German representatives; or, more generally, when the actual war emergencies ceased by reason of our complete victory and the disarmament of the enemy, coupled with the demobilization of our Army and the closing of war activities; or when the declared purpose of the act of 'conserving the man power of the nation, and to increase efficiency in the production of arms, munitions, ships, food and clothing for the Army and Navy,' shall have been fully satisfied. But there is nothing in the words used to justify such a construction. 'Conclusion of the war' clearly did not mean cessation of hostilities; because the act was approved ten days after hostilities had ceased upon the signing of the armistice. Nor may we assume that Congress intended by the phrase to designate the date when the Treaty of Peace should be signed at Versailles or elsewhere

by German and American representatives, since by the Constitution a treaty is only a proposal until approved by the Senate. Furthermore, to construe 'conclusion of the war' as meaning the actual termination of war activities would leave wholly uncertain the date when the act would cease to be operative; whereas Congress evinced here, as in other war statutes, a clear purpose that the date of expiration should be definitely fixed. * * * It was expected that the 'conclusion of the war' would precede the termination of demobilization. Congress, therefore, provided that the time when the act ceased to be operative should be fixed by the President's ascertaining and proclaiming the date when demobilization had terminated.

"It is insisted that he has done so. The contention does violence to both the language and the evident purpose of the provision. The 'date of which shall be determined and proclaimed by the President' is a phrase so definite as to leave no room for construction. This requirement cannot be satisfied by passing references in messages to Congress, nor by newspaper interviews with high officers of the Army or with officials of the War Department. When the President mentioned in his veto message the 'demobilization of the Army and Navy' the words were doubtless used in a popular sense just as he had declared to Congress, on the occasion of the signing the Armistice: 'The war thus comes to an end.' * * * But in fact demobilization had not terminated at the time of the veto of the act of October 28, 1919, or at the time these suits were begun; and, for aught that appears, it is not yet terminated."

The opinion of the United States Supreme Court ends with these words: "The war time prohibition act being thus valid and still in force, the decree in Number 589 is reversed and the case is remanded to the District Court with directions to dismiss the bill."

In the case of *Portsmouth Harbor L. & H. Co.* v. *United States* (1922), 260, U. S. 327, 335, 43 S. Ct. 135, 139, 67

L. Ed. 287, in a dissenting opinion Justices Brandeis and Sutherland, said: "We take judicial notice of the fact that on December 8, 1920, the United States was still at war with Germany and Austria-Hungary. Joint resolution of March 3, 1921, c. 136, 41 Stat. 1359."

*Kahn* v. *Anderson* (1921) 255 U. S. 1, 4 S. Ct. 224, 65 L. Ed. 469; *U. S.* v. *Russell* (D. C. 1920), 265 Fed. 414; *C. A. Weed & Co.* v. *Lockwood* (D. C. W. D. N. Y. 1920), 264 Fed. 453; *Id.,* 266 Fed. 785 (C. C. A. 2nd.); *U. S.* v. *Mulligan* (D. C. 1920), 268 Fed. 893, are cases in which other war statutes were construed and in which it was held that the state of war still existed at the times of the respective decisions, which were subsequent to the date of the requisition in question.

In the case of the *United States of America* v. *Stein* (D. Ct. Northern Dist. Ohio 1921), in equity No. 513 (not reported) the housing act itself was construed in harmony with the decisions in the above cases. In the case last cited the United States sued to quiet titles to land which was requisitioned by it on March 28, 1919, the court said: "Defendant's main proposition seems to be that the war had terminated before the property was requisitioned, and therefore the power to requisition had also been ended as a result of the provisions of section 5 of the original act. This proposition cannot be sustained. The war had not terminated at the time the property was requisitioned. See *Hamilton* v. *Kentucky District* (*Distilleries*) Co., 251 U. S. 146, 40 S. Ct. 106, 64 L. Ed. 194. The holding of this case has been repeatedly reaffirmed in later cases by the Supreme Court and inferior Federal courts."

Moreover, an act of Congress, itself, has determined this question. This is the joint resolution of March 3, 1921 (41 Stat. 1359), which is as follows:

"Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, that in

the interpretation of any provision relating to the *duration or date of the termination of the present war or of the present or existing emergency*, meaning thereby the war between the Imperial German government and the Imperial and Royal Austria-Hungarian government and the government and people of the United States, in any acts of Congress, joint resolutions, or proclamations of the President containing provisions contingent upon the duration or the date of the termination of such war or of such present or existing emergency, the date when this resolution becomes effective shall be construed and treated as the date of the termination of the war or of the present or existing emergency, notwithstanding any provision in any act of Congress or joint resolution providing any other mode of determining the date of such termination." (Italics added.) Thus the further contention of the defendant, that no actual emergency existed at the time of the requisition in question, is met by the decisions quoted of the Supreme Court and other courts and by the terms of the above joint resolution.

In answer to this precise contention, that the emergency had passed, Justice Brandeis said, in the *Hamilton* v. *Kentucky Distilleries Cases, supra:* "But we have also the fact that since these statements (referring to announcements made by the President, etc.) were made and these acts were done, Congress, on October 28, 1919, passed over the President's veto the national prohibition act [27 U. S. C. A.], which in making further provision for the administration of the war time prohibition act, treats the war as continuing and demobilization as incomplete; that the Senate, on November 19, 1919, refused to ratify the Treaty of Peace with Germany; that, under the provisions of the Lever act, the President resumed, on October 30, 1919, the control of the fuel supply which he had relinquished partly on January 31, 1919, and partly on February 20, 1919; that he is still operating the railroads, of which control had been taken as a war measure; and that on November 18, 1919, he vetoed Senate Bill 641,

because it diminished that control; that, pursuant to the act of March 4, 1919, chapter 125, 40 Stat. at Large 1348, he continues to control, by means of the Food Administration Grain Corporation, the supply of wheat and flour; that through the United States Sugar Equalization Board, Inc., he still regulates the price of sugar; that in his message to Congress on December 2, 1919, he urgently recommended the further extension for six months of the powers of the Food Administration; that as Commander-in-Chief he still keeps a part of the Army in enemy occupied territory and another part in Siberia; and that he has refrained from issuing the proclamation declaring the termination of demobilization for which the act provides."

So it appears that after the date of the requisition in question many war activities were in force and the question of the existence of an emergency at that time, and subsequently, was affirmatively determined by the highest court in the land.

In the same case the court, in considering the question of the continued validity of the act, said: "That, on obvious grounds, every reasonable intendment must be made in favor of its continuing validity, the prescribed period of limitation not having arrived; that to Congress, in the exercise of its powers, not least the war power upon which the very life of the nation depends, a wide latitude of discretion must be accorded." And again: "No principle of our constitutional law is more firmly established than that this court may not, in passing upon the validity of a statute, inquire into the motives of Congress. Nor may the court inquire into the wisdom of the legislation. Nor may it pass upon the necessity for the exercise of a power possessed, since the possible abuse of a power is not an argument against its existence." A long list of authorities, embracing decisions of the United States courts and State courts, are cited to sustain the principles enunciated.

The defendant contends that the acquisition of the fee in this easement was not within the war power of Con-

gress. We have seen that the validity of the act is supported by reason and authority.

It provides for the acquisition by requisition of any improved or unimproved land or any right, title, or interest therein; also for the authority to sell and convey the same and that the instruments of conveyance shall be conclusive evidence of the transfer of title to the property to be conveyed; and also for just compensation to the person whose property is requisitioned. All of this suggests the acquisition of the fee in the easement rather than merely the use of the right of way for a temporary sewer.

The deed to the complainant, which is conclusive evidence of the title it purports to transfer, describes the property granted as: "The fee to all the right, title and interest * * * in and to an easement or right of way for sewer twenty-four feet in width, etc."

In the case of the *Manufacturers' Land & Improvement Co. v. U. S. Shipping Board* (1924), 264 U. S. 250, 44 S. Ct. 314, 68 L. Ed. 664, the permanent title to land was requisitioned under the provisions of the wartime statute, the terms of which bear almost an exact analogy to those of the act in question. The validity of the title in the Fleet Corporation was put in issue by an ejectment suit filed by the Land and Improvement Company, which owned the land at the time of the requisition, and the United States Supreme Court in stating the facts said that the Fleet Corporation under the act "requisitioned the fee simple title of the land and took possession," and it sustained the lower Federal court in determining the question against the Land Company.

The lower Federal court in the same case, 284 Fed. 231, 236 (C. C. A. 3), held that when the act of requisition was performed: "The land then belonged absolutely to the Fleet Corporation * * *. But the fee, 'the estate and interest of the plaintiff,' having been acquired and just compensation therefor

determined, the estate and interest of the plaintiff was at an end."

The defendant contends that the use for which the easement was acquired was not a public one and therefore the acquisition lacked a necessary element to its validity and legality. The testimony of J. A. Baird, general manager of the Richmond-Fairfield Railway Company, complainant, was to the effect that when complainant took title to the easement the employees of the government rented the houses in the village of Fairfield and that those houses were connected with the sewer and that the government was making use of the sewer. This was, of course, a public use. The purposes of the act, as has been said, were to provide housing and general community utilities for workers in industries connected with and essential to the national defense. The requisition effected the purposes of the act which were public in their character. However, as has already been pointed out, it was said in the *Kentucky Distilleries Case, supra*, that the court, "May not inquire into the wisdom of the legislation. Nor may it pass upon the necessity of the exercise of power possessed, since the possible abuse of a power is not an argument against its existence."

The defendant further contends that the requisition offends the fifth amendment of the Constitution of the United States in that it constituted a taking of private property without due process of law and taking it for public use was without just compensation. The first contention is predicated upon the fact that she had no opportunity to be heard upon the question of the necessity of the taking.

The Supreme Court of the United States, in the case of *Bragg* v. *Weaver* (1919), 251 U. S. 57, 40 S. Ct. 62, 64 L. Ed. 135, affirmed a decision of the Supreme Court of Appeals of Virginia. The question involved the constitutionality of the Virginia statutes providing for the taking of soil from adjoining landowners to be used in repairing public roads

of the State. It was claimed that the statutes denied the owners the due process of law guaranteed by the fourteenth amendment of the United States Constitution. It will be noted that the fourteenth and fifth amendments of the Constitution, in the matter of due process of law, are analogous, except the former refers to and has only State application, *i. e.,* the taking of private property by the State.

The court said, at page 58 of 251 U. S., 40 S. Ct. 62, 63: "Where the intended use is public, the necessity and expediency of taking may be determined by such agency and in such mode as the State may designate. They are legislative questions, no matter who may be charged with their decision, and a hearing thereon is not essential to due process in the sense of the fourteenth amendment."

*Miss. & R. River Boom Co.* v. *Patterson,* 98 U. S. 403, 406, 25 L. Ed. 206, 207; *A. Backus, Jr. & Sons* v. *Fort St. Union Depot Co.,* 169 U. S. 557, 568, 18 S. Ct. 445, 42 L. Ed. 853, 858; *Adirondack R. Co.* v. *New York,* 176 U. S. 335, 349, 20 S. Ct. 460, 44 L. Ed. 492, 499; *Sears* v. *Akron,* 246 U. S. 242, 251, 38 S. Ct. 245, 62 L. Ed. 688, 698.

And again on page 62 of 251 U. S., 40 S. Ct. 62, 64: "But it is settled by the decisions of this court that where adequate provision is made for the certain payment of the compensation without unreasonable delay, the taking does not contravene due process of law in the sense of the fourteenth amendment merely because it preceded the ascertainment of what compensation is just." *Sweet* v. *Rechel,* 159 U. S. 380, 402, 407, 16 Sup. Ct. 43, 51, 40 L. Ed. 188, 197.

"That the necessity and expediency of taking property for public use is a legislative and not a judicial question, and is not open to discussion." * * * "The question is purely political, does not require a hearing, and is not the subject of judicial inquiry." *Joslin Mfg. Co.* v. *Providence* (1923), 262 U. S. 668, 678, 679, 43 S. Ct. 684, 689, 67 L. Ed. 1167; *Adirondack R. Co.* v. *New York, supra,* at p. 349 of 176 U. S., 20

S. Ct. 460; *Shoemaker* v. *U. S.*, 147 U. S. 282, 298, 13 S. Ct. 361, 37 L. Ed. 170, 184. Thus the question has been settled against the position of the defendant and "is not open to discussion."

The defendant further contends that no title could pass to the government until just compensation is paid her. This point has also been determined against her by the highest judicial authority. In *Joslin* v. *Providence, supra,* at pages 677, 678 of 262 U. S., 43 S. Ct. 684, 688, the court said: "It has long been settled that the taking of property for public use by a State or one of its municipalities need not be accompanied or preceded by payment, but that the requirement of just compensation is satisfied when the public faith and credit are pledged to a reasonably prompt ascertainment and payment, and there is adequate provision for enforcing the pledge." *Sweet* v. *Rechel, supra; Williams* v. *Parker,* 188 U. S. 491, 502, 503, 23 S. Ct. 440, 47 L. Ed. 559, 562, 563; *Bragg* v. *Weaver, supra; Hays* v. *Port of Seattle,* 251 U. S. 233, 238, 40 S. Ct. 125, 64 L. Ed. 243.

An interesting discussion of this issue is found in the case of *Sweet* v. *Rechel, supra,* the opinion being delivered by Mr. Justice Harlan. It was an action to recover land brought by claimants under the will of the original owner against one who was the grantee of the city of Boston. The city acquired title under the statute which provided that upon recordation of a plat thereof title should pass and the party injured might sue the city within one year thereafter for compensation. The prominent question in the case was whether absolute title passed to the city of Boston under the taking statute and Mr. Justice Harlan, for the court, said: "We are of opinion that, upon both principle and authority, it was competent for the legislature, in the exercise of the police powers of the Commonwealth, and of its power to appropriate private property for public uses, to authorize the city to take the *fee* in the lands described in the statute, *prior to making compensa-*

*tion,* and that the provision made for compensating the owner was certain and adequate." (Italics added.)

 Reference heretofore made to the provisions of the housing act make it perfectly plain that under its terms certain and adequate means were provided for the compensation of the defendant and that the public faith and credit were pledged to that end.

In the case of *Bauman* v. *Ross* (1897), 167 U. S. 548, 593, 17 S. Ct. 966, 983, 42 L. Ed. 270, 289, it was said: "By the Constitution of the United States, the estimate of just compensation for property taken for the public use, under the right of eminent domain, is not required to be made by a *jury;* and may be entrusted by Congress to commissioners appointed by a court or by the executive, or to an inquest consisting of more or fewer men than an ordinary jury."

 Nichols, Eminent Domain 938, is as follows: "It is accordingly well settled that the assessment of damages in eminent domain proceedings by a judicial tribunal other than a jury constitutes due process of law, and consequently is not a violation of the fifth amendment when the taking is by the United States, or of the fourteenth amendment when the taking is by authority of a State." It is thus seen that the taking of the easement in the case in judgment and the provisions of the housing act for just compensation to the owner was not violative of the seventh amendment of the United States Constitution which provides for the right of trial by jury.

In the case of the *United States* v. *Stein, supra,* the learned judge said of the housing act of May 16, 1918: "It is sufficient, therefore, to say that in my opinion it is well within the powers conferred by the Constitution upon Congress, and that none of its provisions violate any clause of the Constitution. It is well settled law that the use being public, the necessity for the requisitioning or condemning of property is not to be controlled by the courts, and that the judgment and

discretion of the legislature or of the other agencies to which power is delegated to determine the necessity for taking any given property, cannot be controlled or reviewed by the courts. It is further settled law that in requisitioning or condemning property of this kind for public use, it is not necessary that compensation should be paid in advance, but it is settled law that if reasonable provision is made in the law whereby the property owner may be compensated, all legal requirements will be deemed to have been met and the rights of the property owner duly safeguarded."

For authorities see *U. S.* v. *Forbes* (D. C.), 259 Fed. 585; *Crozier* v. *Fried Krupp Aktiengesellschaft,* 224 U. S. 306, 32 S. Ct. 488, 56 L. Ed. 771; *Bragg* v. *Weaver, supra.*

Since the constitutionality of the statute was not attacked in the case quoted from, the observations of the judge may be subject to the criticism of being dicta, but if so, they so well express our views that we adopt them as fortified by reason and authority and as appropriate in the case at bar.

The principles enunciated as controlling here are founded in reason and in policy, none other than wholesome and salutary. If the powers conferred upon the government by wartime statutes were withheld or rendered ineffectual by judicial determination the republic, in the face of the gravest perils, would be impotent to defend itself and its people.

We decide that the objections presented against the validity of the statute are not well taken. It remains for us to consider the effect of the plea of the statute of limitations (Code 1930, section 5818). As to its interposition to the right of Mrs. Llewellyn, defendant, to recover compensation for the taking of the easement this is not a matter for determination by this court in this suit.

The plea of the statute of limitations, as applicable to the flowage outside of the easement, does not, in our opinion lie. The terms of the instrument of requisition are, in part, these:

"The President of the United States * * * does hereby * * * requisition and take possession of the fee to all the right of way, title and interest * * * to an easement or right of way for sewer, twenty-four feet in width over and upon all that lot, tract, piece or parcel of land * * * said easement or right of way and property upon which the same is located being more particularly described as follows: An easement or right of way for sewer twenty-four feet in width, on, over and upon that certain piece, parcel or lot of land claimed by S. I. and Lyna N. Llewellyn, running in a general easterly direction across the same and to be located approximately as is shown on plat hereto attached and made a part hereof; the said boundary of land * * * containing 103.6 acres, more or less, * .* *."

It will be noted that in accordance with the above the easement over the right of way ran across the tract of land to be located approximately as was shown on a plat attached to and made a part of the instrument of requisition, and of the deed.

We here quote from the testimony of J. A. Baird, a witness for the complainant, and its general manager:

"Q. There is a plat filed with the deed in the clerk's office of Henrico county, showing this sewer right of way and its description, etc.

"A. Yes, sir.

"Q. Does that extend across the entire property of Mrs. Llewellyn?

"A. Yes, sir.

* * * * * * * * *

"Q. Does this sewer, Mr. Baird, that you claim this right of way on Mrs. Llewellyn's property go clear across Mrs. Llewellyn's property?

"A. Yes, sir. The plat shows that the sewer is for a twenty-four-foot strip with fifteen-inch sewer pipe through the Llewellyn property.

"Q. All the way through it?

"A. Yes, sir.

"Q. And you say it goes all the way through?

"A. The plat calls for it.

\* \* \* \* \* \* \* \* \*

"Q. Now, I ask you this question. Why is it that you have not connected this sewer along this twenty-four-foot right of way that you claim, all the way across Mrs. Llewellyn's property?

"A. Because we have been interfered with so drastically by the owners of that property, and have been threatened, etc."

As has been pointed out before, the sewer was constructed on the property to a point approximately half way through it and there stopped, and the sewage at that point flows out and spreads over the easement right of way to the adjacent Llewellyn lands.

Mr. J. A. Baird was interrogated further:

"Q. Have you examined the plan of the right of way and taken that outlet off of her entirely since you were unmolested?

"A. We are contemplating that, yes.

"Q. When?

"A. We will do so when wet get the proper authority.

"Q. Don't you claim the proper authority under this requisition?

"A. We can't do this between now and the 4th day of October. We have been working on it constantly since.

"Q. Have you undertaken to dig or construct or made any effort to take that outlet off of Mrs. Llewellyn's property?

"A. No, but we are going to take it off."

\* \* \* \* \* \* \* \* \*

The witness answered another similar question as follows:

"A. I am answering by stating that I have instructions to go through the entire property. You asked me if it was my intention just to go as far as the sewer and not on the property beyond the outflow, and I answered by stating that it would be cleaned out the entire length, and as soon as we can we expect to build a pipe through there."

The witness also stated that his company had made surveys through the property anterior to extending the sewer through the property and that he had in 1922 and 1923 discussed with officers of the company the method of providing for sewerage, saying: "We started this by buying some pipe with which to conduct this sewerage on through the property * * *."

Mr. S. W. Zimmer, an attorney and counsel for the complainant, testified that he had, acting with Mrs. Llewellyn's attorney, endeavored to get the Housing Corporation to adjust the matter with the Llewellyns with the result that the Housing Corporation agreed to pay a certain sum and the complainant agreed to *complete its sewer line through the property*. (Italics added.)

The deed from the United States to the complainant conveying the easement over the right of way is in terms identical with those of the instrument of requisition.

The purpose of quoting, as we have done, from these papers and from the evidence is to emphasize the controlling point, as we see it, namely, that the sewer was never completed. We are convinced that it was never the purpose and intention of the government to leave that sewer as it is; indeed it is unbelievable. It had no right to do so. It never acquired the right to place a sewer through a portion of the Llewellyn property and make a dumping ground at the stopping point for the deposit of all sorts of offensive excretions. The right it acquired was an easement over the right of way through the entire tract of land as shown on the plat referred to. The presumption is that the government intended to conform to the terms of its muniments of title—not to transcend them. Its transferee and successor in title, the complainant, certainly by its admissions aforesaid, recognized that the sewer was not completed, else it would not have emphasized its intention to complete it.

The complainant cites the case of *Virginia Hot Springs Co.*

v. *McCray*, 106 Va. 461, 56 S. E. 216, 219, 10 L. R. A. (N. S.) 465, 10 Ann. Cas. 179, in which the five-year period of the statute of limitations was pleaded to an action for damages for permanent injury to the lands of the plaintiff by reason of the discharge of sewage into a stream which ran through the said lands. In that case the Hot Springs Company had constructed a system of sewerage, emptying into a large sewer, which discharged the collected human and animal excrement from the hotels, laundries, and other buildings into the Hot Springs run. There was no question as to the completeness of the system or the permanence of the injury. So far as human foresight could determine the sewer structure would continue as constructed for all time. The injury to the plaintiff was the same on the first day of the use of the system as it was thereafter and would inevitably continue so. The thing was complete—finished and permanent. The facts are the opposite in the case in judgment. It could not be contended that the sewer as partially constructed, on Mrs. Llewellyn's lands, would remain so. The idea of permanency, in its state, was negatived by the facts and by every reasonable intendment. The cause of the complaint, on the part of the defendant, of flowage outside of the easement might cease at any time that the government or the complainant should complete the sewer, as it was their duty to do; this, of course, would not affect the question of damages already suffered, if any.

The case of *Umscheid* v. *City of San Antonio* (Tex. Civ. App.), 69 S. W. 496, was quoted with approval by this court in the *Hot Springs Case, supra*, wherein it was held: "It was proper to submit to the jury the question whether the injury to plaintiff's lands was temporary or permanent, and if the defendant can show that it can and will discontinue the injury, then it should be held to be temporary and not permanent."

In the case in judgment the complainant has shown that it

could have—that it can, and that it will, complete the structure and thus discontinue the injury.

In the *Hot Springs Case* this court said, at page 471 of 106 Va., 56 S. E. 216, 220: "The question presented by the rejected plea is simply whether the injury is of a permanent character, resulting from a permanent structure, and is a mere question of fact, which, like all other alleged facts, can be submitted to and decided by a jury. The intention of the defendant in such a case is to be determined in the .same way as it is determined in other cases, and there is no difficulty in determining it from the defendant's acts and the nature and purpose of the structure which caused the injury."

We think the trial court was right in holding that the plea of the statute of limitations did not lie as to damage to the defendant for flowage outside of the easement.

The evidence leaves no room for doubt that there now exists on the defendant's premises a nuisance which is a menace to the health and happiness of the people of a populous community. It is a situation that demands prompt and effective preventive steps.

██ We hold that the complainant is possessed of the fee simple title in an easement over the right of way as described in its deed from the United States and shown on the plat which is a part of said deed, over and across the lands of the defendant, for the purpose of a closed sewer, and that the defendant has no right to interfere with the construction and maintenance of the same. The trial court should enter an injunction restraining her from so doing; and the discharge and deposit of sewerage, as complained of, should be discontinued as promptly as it can be corrected, and unless it is discontinued within a reasonable time, the trial court should restrain and enjoin the same. We have already disposed of the questions of the applicability of the statute of limitations.

The decree complained of is reversed in part and affirmed

in part, and the case is remanded to the trial court for its further decree in conformity with the views expressed herein.

*Reversed in part.*

RICHMOND, APRIL 10, 1931.

*Upon Rehearing.*

BROWNING, J.:

The original opinion and order are amended in so far as they construe the rights of the parties under the easement. No question as to the construction of the easement is raised or involved in this record, and therefore so much of the original opinion and order as limits the size of the sewer pipe to be used to fifteen inches is stricken therefrom, without prejudice.

*Reversed and remanded.*